### In re SHERBROOKE SODDING CO.

### No. 6–96–CV–41.

United States District Court,
D. Minnesota,
Sixth Division.

Aug. 31, 1998.

Thomas Richard Olson, Kimberly Price Anderson, Olson Law Office, St. Paul, MN, Gregg M. Corwin, Corwin Law Office, St. Louis Park, MN, for Sherbrooke Sodding Co., Progressive Contractors Inc. and Northern Improvement Co.

Donald J. Mueting, Kerri Stahlecker Hermann, Linda M. Bullen, Minn., Atty. Gen., St. Paul, MN, for Minnesota Dept. of Transp. and James N. Denn.

Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, Lisa Higdon MacPhee, U.S. Dept of Transp., Washington, DC, Richard S. Ugelow, Jay D. Adelstein, Andrew H. Tarsy, U.S. Dept of Justice Civil Rights, Washington, DC, Dana R. Carstarphen, U.S. Dept of Justice, Washington, DC, for U.S. Dept. of Transp., James N. Denn and Federico F. Pena.

## ORDER

ROSENBAUM, District Judge.

This case raises a challenge to a Minnesota-implemented federal program promoting affirmative action. The federal program funds highway construction, maintenance, and repair. The matter is before the Court on cross-motions for summary judgment.

### I. *Background*

Three cases have been consolidated, each involving Sherbrooke Sodding, Co. or Sherbrooke Turf, Inc., both Minnesota corporations, (collectively referred to as "the companies"). The companies provide turf establishment and erosion control—they lay sod. The companies are subcontractors on state and federally funded highway projects. Sherbrooke Sodding, owned by David, Bruce, and Richard Sherbrooke, has been in business for 32 years. Sherbrooke Turf, a proprietorship owned by David Sherbrooke, has operated for one year. The Sherbrookes are white males.

The defendants are the Minnesota Department of Transportation ("MnDOT") and the United States Department of Transportation ("USDOT").

In each case the Sherbrookes, through Sherbrooke Sodding and Sherbrooke Turf, challenge the Disadvantaged Business Enterprise ("DBE") provisions of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). They correspondingly challenge USDOT's implementing federal regulations and the MnDOT DBE program. The plaintiffs claim they have been illegally disadvantaged when bidding on road construction projects because the companies are owned by white males.

### A. *Federal Statutes—The History of the ISTEA*

Congress passed a series of highway construction and funding acts beginning in 1982. The first was the Surface Transportation Assistance Act ("STAA"), Pub.L. No. 97–424, 96 Stat. 2097. Section 105(f) of the STAA required that not less than 10% of its appropriated federal funds be paid to small businesses owned and controlled by socially and economically disadvantaged individuals, as defined by Section 8(d) of the Small Business Act. These businesses were known as Disadvantaged Business Enterprises, or "DBEs". *See* 96 Stat. 2100.

The STAA refers to the Small Business Act ("SBA"). Section 8(d) of the SBA designates classes of individuals who are presumed to be socially and economically disadvantaged: "[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans." 15 U.S.C. § 637(d)(3)(C).

In 1987, Congress passed a second such act, the Surface Transportation Uniform Relocation Assistance Act ("STURAA"), Pub.L. No. 100–17, 101 Stat. 132. This Act, at § 106(c), also directed that not less than 10% of its appropriated federal funds be expended with DBEs. The STURAA, however, expanded the definition of DBEs to include women who were, by Congressional enactment, also presumed to be socially and economically disadvantaged individuals. *See* 101 Stat. 145–146.

The third enactment, the one with which this case is immediately concerned, is the Intermodal Surface Transportation Efficien-

cy Act of 1991 ("ISTEA"), Pub.L. No. 102–240, 105 Stat. 1914. Here, Congress again authorized states to use federal highway funds, provided that not less than 10% of those funds be expended with DBEs. This Act maintained the STURAA's designation of women as presumed socially and economically disadvantaged DBE individuals. *See* 101 Stat. 146; 105 Stat. 1919–20.

Section 1003(b) of the ISTEA defines a "small business" as one with average annual gross receipts of less than $15,370,000 for the preceding three fiscal years, adjusted for inflation. *See* 1003(b)(2)(A) and (B). This amount was increased to $16,600,000 in 1994. *See* 49 C.F.R. § 23.62 (1996); 59 Fed.Reg. 67,367 (Dec. 29, 1994). Section 1003(b) incorporates the SBA's § 8(d) definition of "small business concerns owned and controlled by socially and economically disadvantaged individuals."

ISTEA expired by its terms on September 30, 1997.[1] Its DBE provision, however, still applies to funds obligated, but unspent, from prior fiscal years. ISTEA and its DBE provisions apply to Minnesota's highway construction projects being let in 1998 which rely on fiscal year 1997 funding. These funds, and the ISTEA's DBE provisions, are at issue here.

### B. *Federal Regulations*

The USDOT promulgated federal regulations to implement its DBE programs. *See* 49 C.F.R. § 23.1 (1996). The regulations define groups which are presumptively "disadvantaged," including:

(a) "Black Americans," which includes persons having origins in any of the Black racial groups of Africa;

(b) "Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

(c) "Native Americans," which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

(d) "Asian–Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas; and

(e) "Asian–Indian Americans," which includes persons whose origins are from India, Pakistan, and Bangladesh.

49 C.F.R. § 23.62 (1996). White males are not presumed to be disadvantaged.

The regulations provide that individuals who are not members of any of the listed groups may apply for DBE status on a case-by-case basis. Such DBE status-seekers must actually demonstrate both social and economic disadvantage. *See* 49 C.F.R. § 23.62 (1996); 49 C.F.R. pt. 23, subpt. D, App. C (1996). USDOT also recognizes, for purposes of USDOT-assisted programs, anyone found to be socially and economically disadvantaged by the Small Business Administration, under Section 8(a) of the SBA. *See* 49 C.F.R. § 23.62 (1996).

Historically, the Federal Highway Administration ("FHWA") gave states discretion in determining how to apply contract-specific goals to DBE prime contractors. This changed on July 16, 1996, when, by memorandum, the FHWA required states to "count the participation of DBE primes as 100 percent both towards meeting overall recipient goals and ... toward meeting contract-specific goals." This means that if the prime contractor is a DBE, it is exempt from DBE subcontract requirements.

This situation contrasts with non-DBEs bidding to be general contractors. If a non-DBE is the prime contractor, it must meet DBE requirements. MnDOT had required DBEs, bidding as general contractors, to meet DBE subcontract requirements. However, MnDOT changed its policy on September 23, 1996, when USDOT sent notice to MnDOT to comply with the July 16, 1996, memorandum.

---

**1.** Congress passed the Surface Transportation Extension Act of 1997 ("STEA"), Pub.L. No. 105–130, 111 Stat. 2552, which provided a six month extension of highway, highway safety, and transit programs pending enactment of a law reauthorizing the Intermodal Surface Transportation Efficiency Act of 1991. The STEA extended the ISTEA from October 1, 1997, through March 31, 1998.

## C. *Minnesota's DBE Program*

MnDOT developed, and implemented, its DBE program in 1982 to qualify for federal highway funding assistance. As a USDOT highway program fund recipient, MnDOT administers its DBE program pursuant to federal regulation 49 C.F.R. § 23.1 (1996). It has done so on each federally-funded highway project let since 1982.

To participate as a DBE in Minnesota, a firm must be certified under the 49 C.F.R. § 23.1 criteria. MnDOT uses a two-step certification process. First, an applicant must complete a DBE certification application. Second, MnDOT makes an on-site review to verify the application and other items not at issue here. The federal regulations also require that MnDOT establish challenge procedures to determine whether an individual, presumed to be socially and economically disadvantaged, is in fact socially and economically disadvantaged. *See* 49 C.F.R. § 23.69(a) (1996). Under this program, MnDOT may commence a DBE decertification process any time it has reason to believe a certified firm is out of compliance with 49 C.F.R. § 23.1. Third parties may also challenge the status of a MnDOT-certified DBE.

Federal regulations require states to establish an "overall goal" for DBE participation on federally assisted projects. *See* 49 C.F.R. §§ 23.45(g)(4), 23.64 (1996). These regulations require that MnDOT's DBE program consider the number, size, and type of contracts to be awarded. In doing so, MnDOT must project the number and types of certified disadvantaged businesses and their availability in the area. It must also review past results in obtaining contracts using disadvantaged businesses when establishing its annual goals. *See* 49 C.F.R. § 23.45(g)(5) (1996).

Since 1994, MnDOT has set an annual overall DBE participation rate goal of 11%. Before 1994, this rate was 10%. MnDOT's annual rate has been reached every year except 1991 and 1997. USDOT has never suspended or revoked Minnesota's (or any other state's) federal funding, nor has it imposed sanctions or taken punitive action against a state which failed to meet its annual DBE percentages.

Federal regulations also require that MnDOT establish a DBE "contract goal" for each federally assisted project. *See* 49 C.F.R. §§ 23.45(g)(4), 23.64 (1996). MnDOT does so for each project financed in whole or in part with federal funds. In establishing this goal, MnDOT considers the project's location, its dollar amount, the availability of certified DBEs, and the scope of work and the project's subcontracting opportunities. The parties have stipulated that MnDOT does not independently determine whether or to what extent discrimination may exist when setting its goal rates.[2]

When this lawsuit's road projects were bid, MnDOT used three methods to achieve its annual DBE prime contractor participation rate: (1) Maximum Participation Requirement; (2) Good Faith Effort; and, (3) No Goal. Prior to 1995, MnDOT used Set–Asides as a fourth method to meet its annual DBE participation rate. Under Minnesota's Maximum Participation Requirement scheme, a contract was awarded to the lowest responsible bidder meeting the DBE percentage. In September, 1997, MnDOT notified the USDOT that it had discontinued using this method the previous May. USDOT concurred in MnDOT's decision.

The Good Faith Effort scheme awards a contract to the lowest responsible bidder meeting the DBE percentage, or which otherwise demonstrates its good faith efforts to do so. If the project's low bidder does not satisfy MnDOT's DBE percentage rate, MnDOT consults with the low bidder to determine its good faith efforts. The No Goal method, of course, contains no DBE percentage requirement. The now-rejected Set Aside method allowed awards only to the lowest responsible certified DBE.

Plaintiffs challenge the ISTEA, 49 C.F.R. § 23.1, and MnDOT's DBE program facially, and as applied.

---

**2.** The Court expresses its appreciation to the parties, who have immeasurably assisted it by preparing a comprehensive Stipulation of Facts. This Stipulation is adopted by the Court and may be considered part of this Order.

### D. *Projects at Issue*

The companies were interested in subcontracting for highway sodding work on six federally-assisted projects—"Airport," "Wilkin," "Fergus Falls," "Otter Tail," "Wright," and "Anchor"—awarded between May, 1994, and July, 1997. MnDOT's DBE percentages on the projects ranged from 5% to 13%. The companies claim that their white male ownership, which denied them presumptive DBE status, unlawfully encumbered their right to be selected for this work.

Each project was awarded to the responsible contractor submitting the lowest responsive bid. MnDOT required the prime contractor to meet its applicable DBE requirements. On two projects, the prime contractors met the stated DBE participation rate. On four of the projects, successful prime contractors failed to meet the project's DBE participation rate, but satisfactorily demonstrated to MnDOT their good faith effort to attract DBEs. DBEs got turf and sodding subcontracts on four of the six projects. These presumed DBEs were owned and controlled by a woman, Native American, or Black American.

The $4,724,582.03 Airport Project was awarded on March 3, 1995, to Northern Improvement as a responsible prime contractor. MnDOT prescribed a 12% DBE Maximum Participation Requirement. Northern Improvement certified the use of eight DBEs to perform 12% of the work. Sherbrooke Sodding bid on the Airport Project's turf work. Its bid was the lowest of the turf subcontractors, and the parties stipulate that Northern Improvement wished to retain Sherbrooke Sodding for the work. The subcontract for turf work went to Lawn and Driveway Services, however. Lawn and Driveway Services is owned by a woman, making it a DBE; it is presumed to suffer social and economic disadvantage on that basis.

The $3,246,183.32 Wilkin Project was awarded to Progressive Contractors, Inc. ("PCI"), on January 19, 1995. The project was given an 11% Good Faith requirement. PCI certified the use of eight DBEs, yielding a 9.4% DBE participation. MnDOT considered PCI's bid to be responsive, because PCI showed it could not meet the 11% requirement despite a good faith effort. Sherbrooke Sodding submitted the lowest bid for this turf work. The parties stipulate that PCI wanted to use Sherbrooke Sodding. PCI rejected Sherbrooke Sodding's lower bid in order to select Lawn and Driveway Services—the higher-bidding DBE—as its subcontractor.

The third challenged project is Fergus Falls. This job was awarded to Mark Sand & Gravel ("MS & G") on May 17, 1994, as a responsible contractor for a bid of $1,978,-907.01. MnDOT assigned the Fergus Falls project a 10% Good Faith requirement. MS & G certified the use of eight DBEs to achieve a 9.1% participation. MS & G's bid was deemed responsive; it demonstrated that it could not meet the 10% requirement despite good faith efforts.

MS & G subcontracted the Fergus Falls turf work to Elijah Company, a Black American-owned business, presumed to be socially and economically disadvantaged on that basis. Here again, Sherbrooke Sodding submitted the lowest turf work bid. Ultimately, Elijah Company was replaced by Lawn and Driveway Service, the female-owned DBE discussed above.

The fourth project is the Otter Tail Project, also awarded to MS & G for a bid of $2,667,039.63, on February 29, 1996. MS & G was considered to be a responsible contractor. This project bore a MnDOT 12% Good Faith requirement. MS & G certified the use of four DBEs, providing an 11.03% participation toward the DBE percentage requirement. MS & G showed it could not meet the 12% requirement despite good faith efforts. Sherbrooke Sodding bid on the turf work for the Otter Tail Project, though it is not clear whether its bid was lowest. MS & G subcontracted the turf work to WWIG, a DBE. WWIG is a Native American-owned business, presumed to be socially and economically disadvantaged on that basis. In October, 1996, WWIG encountered problems completing the turf work. After seeking, and receiving, MnDOT's approval, MS & G subcontracted some of the remaining work to Sherbrooke Sodding.

The fifth project is the Wright Project awarded on June 23, 1997, to Bauerly Brothers, Inc., for a bid of $9,376,205.55. The

project was originally assigned a 13% Maximum Participation requirement. However, this Court, on April 27, 1997, granted a temporary restraining order sought by Sherbrooke Turf, and enjoined MnDOT from issuing a contract with a maximum participation requirement. MnDOT modified the contract to a 13% Good Faith requirement. Bauerly Brothers certified the use of 13 DBEs which would do 5.2% of the work. Bauerly Brothers' bid was deemed responsive. It is unclear from the record whether Sherbrooke Turf submitted a bid on this project. Bauerly Brothers subcontracted the turf work to a non-DBE contractor.

The final project, the Anchor Project, was awarded on July 11, 1997, to PCI as a responsible contractor, bidding $740,031.29. The project was given a 5% good faith effort requirement. PCI certified that it would achieve 5.4% DBE participation. PCI subcontracted the turf work to a non-DBE subcontractor. Sherbrooke Turf did not submit a bid to PCI for the turf work.

### E. Civil Actions

The first of these consolidated cases was filed on February 13, 1996, by Sherbrooke Sodding and two prime contractors, Northern Improvement and Progressive Contractors, Inc. The suit involved the Airport, Wilkin, Fergus Falls, and Otter Tail Projects. The two prime contractors were dismissed for lack of standing on April 15, 1998.

Sherbrooke Turf filed the second action concerning the Wright project on April 22, 1997. In this second case, Sherbrooke Turf sought a Temporary Restraining Order. On April 24, 1997, the Court entered an Order enjoining MnDOT from "the issuance of the contract for [the Wright] project ... to the extent that the contract contains a 13% Option II Maximum Participation Requirement for Disadvantaged Business Enterprise."

The third action was filed on June 16, 1997, by Sherbrooke Turf relating to the Anchor Project. Sherbrooke Turf once again sought a temporary restraining order, and the

Court, by Order, dated June 27, 1997, denied the motion.

The three actions were consolidated by Order, dated June 15, 1997. Sherbrooke Sodding and Sherbrooke Turf, plaintiffs, and US-DOT and MnDOT, defendants, have filed cross-motions for summary judgment.

### F. The Claim

Plaintiffs challenge ISTEA's Congressionally-mandated DBE program and its administration by MnDOT. There is no dispute that the DBE program, both facially and as administered by MnDOT, affords preferential status on the basis of a company owner's race, sex, and national origin. Plaintiffs claim the program violates the equal protection clause of the United States Constitution.[3]

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, there are no disputed material facts; the matter turns on a question of law, and summary judgment is appropriate.

### B. Supreme Court Precedent

The United States Supreme Court has visited the question of affirmative action in federal government expenditures several times during the 1990s.

In 1990, it decided Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), concerning the Federal Communication Commission's ("FCC") policies respecting ownership of broadcast licenses. The FCC maintained dual policies favoring minority applicants for federal broadcast

---

**3.** The equal protection clause of the Fourteenth Amendment directs that "No state ... shall deny any person within its jurisdiction the equal protection of the laws." The clause, as written, only applies to state, as opposed to federal actions.

The Supreme Court has found an implied "equal protection component" applicable to the federal government within the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

licenses. The first policy considered minority ownership to be a "plus" when a station sought a broadcast license. This "plus" factor was weighed in with other factors when comparing license applicants. *See id.* at 557, 110 S.Ct. 2997. The second policy favored awarding minority owners "opportunities to receive reassigned and transferred licenses through the so-called 'distress sale' policy." *Id.*

The FCC's policies were challenged on Fifth Amendment equal protection grounds. The Court found "that a congressionally mandated, benign, race-conscious program that is substantially related to the achievement of an important governmental interest is consistent with equal protection principles so long as it does not impose undue burdens on nonminorities." *Id.* at 596–597, 110 S.Ct. 2997. The 1990 Court determined that race-based measures do not have to be " 'remedial' in the sense of being designed to compensate victims of past governmental or societal discrimination" as long as they "serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." *Id.* at 564–565, 110 S.Ct. 2997.

Five years later, the Supreme Court revisited federally mandated, race-based, affirmative actions programs. In *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Court overruled parts of *Metro Broadcasting*, altering the test applied when considering the constitutionality of affirmative action programs.

■ As a preliminary matter, the Court determined that affirmative action programs, whether state or federal, were subject to "strict scrutiny" analysis. The Court had previously held, in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 508, 511, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), that only a state's and local government's affirmative action programs were subject to this "strict scrutiny" standard, while affording congressional enactments a more deferential standard of review. *Adarand* applied *Croson's* strict scrutiny test to federal race-conscious preference programs. The *Adarand* Court found that "federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235, 115 S.Ct. 2097.

■ The DBE program under consideration concerns not only race and national origin, but also includes gender-based preferences. A slightly different analysis may apply to gender-based classifications. For a court to uphold gender-based preferences, the government must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). This intermediate test is not as stringent as the strict scrutiny test used for racial preferences. At oral argument, USDOT asserted that the gender preferences in the DBE program would survive a strict scrutiny test, and invited the Court to apply the strict scrutiny test to both the race and gender preferences. For purposes of this motion, the Court does so.

### C. Strict Scrutiny Applied

■ The ISTEA, its implementing regulations, and the DBE program before the Court, mandate consideration of race and gender in deciding whether a party is able to obtain government largesse. As such, the government bears the burden of proving that the DBE program is constitutional. *See Adarand*, 515 U.S. at 223, 115 S.Ct. 2097; *United States v. Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. Under *Adarand's* "strict scrutiny" test, defendants must show the DBE race and (for present purposes) gender classifications "serve a compelling governmental interest, and ... [are] narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235, 115 S.Ct. 2097.

MnDOT claims it simply implements a federal program and, in doing so, is relieved of any duty to show its program is narrowly tailored to achieve the program's purposes. *See Milwaukee County Pavers Assoc. v. Fiedler*, 922 F.2d 419, 423 (7th Cir.1991); *see also Ellis v. Skinner*, 961 F.2d 912, 916 (10th

Cir.1992); *Tennessee Asphalt Co. v. Farris,* 942 F.2d 969, 975 (6th Cir.1991). USDOT does not seriously challenge this position. As a result, the Court assumes MnDOT has properly implemented the federal program in question. Therefore, the Court turns to whether the ISTEA's federally sponsored DBE program survives strict scrutiny.

### 1. *Compelling Governmental Interest*

The USDOT claims that the "compelling governmental interest served by Section 1003(b) of ISTEA is the remedying of the negative effects of discrimination on the ability of small minority-owned contractors to compete on an equal footing with non-minority contractors in the highway construction industry nationwide." (USDOT, Sum.Jud. Mem., p. 3.) USDOT makes two arguments in this respect. First, it argues that Congress has properly considered the issue and found a compelling interest; second, USDOT denies that Congress is required to make localized findings of discrimination in order to demonstrate this compelling interest.

In support of its first proposition—to validate its claim that Congress adequately considered the question of discrimination against minority subcontractors—the government produced over 13,000 pages of documents. It also offered a Department of Justice ("DOJ") survey titled "The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey." 61 Fed.Reg. 26,050 (1996). The DOJ issued this survey in response to the Supreme Court's *Adarand* ruling. The survey recounts Congress's debates and examinations of discrimination and its possible remedies.

The survey lists at least 29 hearings since 1980 concerning the effect of racial discrimination on minority-owned businesses. *Id.* at 26051–52. According to the survey, "[t]he theme that emanates from this record is unequivocal: Congress has adopted race-conscious remedial measures in procurement directly in response to its findings that 'widespread discrimination, especially in access to financial credit, has been an impediment to the ability of minority-owned business to have an equal chance in developing our economy.'" *Id.* at 26052 (quoting *Affirmative Action Review: Report to the President* 55 (1995)). Congress has clearly visited this issue, and has consistently found that effects of discrimination remain.

■ The Supreme Court, however, requires that to establish the essential governmental interest in remedying past discrimination, "judicial, legislative, or administrative findings of constitutional or statutory violations" must be made. *Croson,* 488 U.S. at 497, 109 S.Ct. 706 (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). It is not sufficient to show that Congress has been concerned about an issue; Congress must make findings showing the problem's existence and the specific cure it prescribes. "Only then does the government have a compelling interest in favoring one race over another." *Croson,* 488 U.S. at 497, 109 S.Ct. 706. USDOT's submissions detail only five "possible allegations" of discrimination: two in Illinois, two in Massachusetts, and one in New York. Plaintiffs claim these "findings" lack the specificity or the solution-specific determinations which can justify imposing a race, origin, or gender preferential program in Minnesota, let alone across the nation.

USDOT responds that, being a national legislature, Congress is not required to make particularized findings of discrimination, but may consider the nation as a whole. "The degree of specificity required in the findings of discrimination and the breadth of the discretion in the choice of remedies may vary with the nature and authority of the governmental body." *Croson,* 488 U.S. at 489, 109 S.Ct. 706 (quoting *Fullilove,* 448 U.S. at 515–16, n. 14, 100 S.Ct. 2758 (Powell, J., concurring)).

Congress is certainly not a city council. While there is a paucity of specific findings of discrimination—which may well be difficult to document—the Court is aware that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand,* 515 U.S. at 237, 115 S.Ct. 2097. The Court also recognizes that the District Court, hearing *Adarand* on remand, found Congress had a "strong basis in evidence," providing a "compelling governmental inter-

est" in enacting a race-conscious procurement program. *Adarand Constructors, Inc. v. Pena,* 965 F.Supp. 1556, 1576–77 (D.Col. 1997). For purposes of this motion, this Court agrees.

### 2. Narrowly Tailored

There remains, however, the second half of the strict scrutiny analysis: Is the program before the Court narrowly tailored to serve the established compelling governmental interest? *See Adarand,* 515 U.S. at 235, 115 S.Ct. 2097.

■ This analysis considers several factors, "including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality); *see also id.* at 187, 107 S.Ct. 1053 (Powell, J., concurring).[4]

### a. Consideration of Race–Neutral Alternatives

■ The Supreme Court also requires an inquiry into "whether there was 'any consideration of the use of race-neutral means to increase minority business participation' in government contracting." *Adarand,* 515 U.S. at 237–38, 115 S.Ct. 2097 (quoting *Croson,* 488 U.S. at 507, 109 S.Ct. 706).

While claiming that Congress considered race-neutral alternatives, USDOT offers no evidence that Congress considered alternatives to ISTEA's DBE Program. USDOT offers only the fact that in 1978—20 years ago, and 4 years before Congress passed the first of these highway-funding Acts—a small business interest subsidy program was only minimally effective. It points only to Section 8(d) of the SBA, which was, apparently, insufficient to aid minority owned businesses in overcoming discriminatory federal procurement barriers.

Plaintiffs deny that this constitutes a real consideration of race-neutral mechanisms, and particularly deny that this illustrates consideration of a race-neutral mechanism in relation to the passage of ISTEA. Plaintiff's position draws strong support from USDOT's own statements. Senator Bud Shuster, Chairman of the Committee on Transportation and Infrastructure, asked USDOT whether non-racial alternatives were considered by Congress or USDOT before establishing the race-conscious requirement. US-DOT answered that it was "[n]ot aware of any race-neutral alternative considered prior to the DBE program" at the time Congress and the USDOT adopted the current DBE program. (USDOT, Exh. 7.) The Court finds the United States has not established that Congress considered any race-neutral alternatives prior to the passage of the ISTEA and the implementation of its DBE-enabling regulations.

The Supreme Court, itself, suggested several such race-neutral alternatives, including, "[s]implification of bidding procedures, relaxation of bonding requirements, ... training and financial aid for disadvantaged entrepreneurs of all races[,] ... elimination or modification [of bureaucratic inertia, and the] prohibit[ion of] discrimination in the provision of credit or bonding by local suppliers and banks." *Croson,* 488 U.S. at 509–510, 109 S.Ct. 706. The United States' failure to consider race, national origin, and gender neutral alternatives strongly suggests the DBE program is Constitutionally flawed.

### b. Limited Duration

■ In *Adarand,* the Court restated its direction that a DBE Program must be "appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate.'" 515 U.S. 200, 238, 115 S.Ct. 2097, 132 L.Ed.2d 158 (quoting *Fullilove,* 448 U.S. at 513, 100 S.Ct. 2758). USDOT suggests that ISTEA's DBE is of limited duration and subject to Congression-

---

**4.** Justice Powell listed similar factors in his concurrence in *United States v. Paradise,* 480 U.S. at 187, 107 S.Ct. 1053:

    (I) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties.

al and Executive oversight. USDOT points to ISTEA's Section 1003(b), its sunset provision, which provides some opportunity to reconsider the program. On the other hand, even though ISTEA expired on September 30, 1997, its DBE provisions continue to apply to funding not yet expended. Plaintiffs argue that the Supreme Court's "limited duration" direction is not satisfied when Congress simply re-enacts this highway-construction funding program, without any consideration of the program's own discriminatory effects.

The Court finds this factor to be neutral. It is possible that Congress does reconsider these issues in reenacting its highway construction funding statutes; it is equally likely that it does not. The evidence is spare and equivocal as to both positions.

### c. *Burden*

■ USDOT argues that plaintiffs have not shouldered an unconstitutional burden as a result of ISTEA's DBE program. They remind the Court "[I]t is not a constitutional defect [that a program] may disappoint the expectations of non-minority firms. When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Fullilove*, 448 U.S. at 484, 100 S.Ct. 2758. USDOT points to Sherbrooke Sodding's gross revenues which have either been steady or increased over the past five years.[5] Sherbrooke Turf has been in existence for a year and reflects annual revenues between one and two million dollars. Thus, USDOT argues the burden, if any, imposed upon plaintiffs is relatively light.

Plaintiffs reply that the DBE program's impact falls particularly, and disproportionately, hard on specialty subcontractors like themselves. Highway turf work is less capital-intensive than several other highway construction/maintenance sub-trades, such as grading, guardrail, landscaping, and fencing. As such, the DBE program falls heaviest on smaller companies engaged in non-capital-intensive operations. When a preference is given to a non-white or non-male portion of this group, the preference's impact necessarily falls heaviest on white male contractors who practice these trades. There being so few well-capitalized DBEs, the reality is that prime contractors typically award DBE contracts to the less-capitalized DBEs in order to meet MnDOT's goals. As shown above, in the challenged projects, prime contractors wishing to use either Sherbrooke Sodding or Sherbrooke Turf were unable to do so and still meet the DBE goals. Thus, in this context, the burden is not broadly shared, but falls heavily on the shoulders of plaintiffs and others similarly situated.

The Court finds that plaintiffs bear an undue burden under the DBE program. The typical way to compete in the subcontracting marketplace is to provide quality work at the lowest possible price. Plaintiffs would have won in this competition, but have lost on numerous occasions simply because of their race, national origin, and gender.

### d. *Flexibility*

■ USDOT claims the DBE program has adequate safeguards and provides for flexible waivers and certifications. It notes that a challenger can rebut the statutory and regulatory presumption of disadvantage. *See* 49 C.F.R. § 23.69 (1996). A third party can mount this challenge. *See id.* It also points out that USDOT and MnDOT treat the annual and project goals as aspirational, not inflexible, quotas, and further notes that even when the goals have not been met, USDOT has not sanctioned MnDOT.

Plaintiffs challenge this claim of flexibility. First, in order to acquire federal funds, states must subscribe to the statutory and regulatory scheme. And if the goals are considered to be attainable, they must be attained. Then plaintiffs point out that DBE status is presumed for those awarded the statutory or regulatory imprimatur—this privileged and advantaged position is not freely given and must be "earned" by those born white and male. There are precious few cases in which the racial, national, or gender-given DBE status has been lifted by

---

5. The Court sets aside, as being beyond the scope of this matter, the question of whether or how annual revenues correlate with profitability. Obtaining revenue is one thing; making a profit is quite another.

the state, and a private challenge to a competitor's status imposes its own burdens. In their view, these realities amount to a denial of their equal rights under the law.

The Court agrees with the plaintiff. Government-granted preferences, based on immutable conditions acquired at birth, confer benefits on those who have done nothing to earn them, and conversely, impose burdens on those who have done nothing to require them to be shouldered.[6]

If there are circumstances under which such preferences comport with the United States Constitution, and its Equal Protection Clause, they do not exist here. Whatever the terminology or palliative applied, whether the program be called an "aspirational goal" or ameliorated by a "flexible waiver," the bottom line is that there is still a quota that is imposed by the government. This quota penalizes some and advantages others, each without Constitutional justification.

### e. Random Inclusion

Plaintiffs argue that the DBE Program is not narrowly tailored because of the random or haphazard inclusion of presumptively socially and economically disadvantaged groups. Plaintiffs argue that the laundry list of groups, genders, and nationalities enumerated at 49 C.F.R. § 23.62, upon which is conferred presumptive DBE status, provides evidence of random and haphazard inclusion of individuals in the DBE Program. The list includes Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, Asian Indian Americans, and Women. The regulations further parse these larger groups. For instance, Native Americans include American Indians, Eskimoes, Aleuts, or Native Hawaiians. Plaintiffs argue that there is no evidence of discrimination or past discrimination against an Aleut or Native Hawaiian contractor in Minnesota. Further, plaintiffs assert that there is no evidence demonstrating the bare existence of a Aleutian or Native Hawaiian contractor. The inclusion of almost all non-white people does not reflect a "narrowly tailored" focus to the DBE Program.

This Court shares the Supreme Court's concern, expressed in *Croson,* when analyzing the City of Richmond's program. The Court stated that:

> There is absolutely no evidence of past discrimination against ... Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry.... It may well be that Richmond has never had an Aleut or Eskimo citizen. The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination.

*Croson,* 488 U.S. at 506, 109 S.Ct. 706.

While the Court has assumed for purposes of this motion that a compelling interest exists, defendants have been singularly unable to demonstrate the connection between those individuals upon whom DBE status has been conferred by the Congress and the regulations, and any present or past discrimination against the races or gender of those individuals. After consideration of the relevant factors, the Court concludes that the DBE Program is not narrowly tailored to serve a compelling governmental interest. Thus, the DBE program fails *Adarand's* strict scrutiny test, and is unconstitutional.

### III. Conclusion

For the reasons stated herein, IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment is granted.

2. Defendants' motions for summary judgment are denied.

3. Section 1003(b) of the ISTEA, Section 8(d) of the SBA, 15 U.S.C. § 637(d), the regulations promulgated thereunder at 49 C.F.R. § 23.1, and the MnDOT DBE program, are unconstitutional as applied to high-

---

**6.** As Justice Thurgood Marshall wrote, as counsel for the NAACP, in an appellant's brief in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954): "When the distinctions are based upon race and color alone, the state's action is patently the epitome of that arbitrariness and capriciousness constitutionally impermissive under our system of government." Brief for Appellants, Oct. Term, 1952, at 5–6.

way construction contracts in the State of Minnesota.

4. MnDOT is permanently enjoined from soliciting bids for highway programs which incorporate DBE participation requirements.