# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1665

_____

| | | |
|---|---|---|
| Sherbrooke Turf, Inc., | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Minnesota Department of | * | |
| Transportation, et al., | * | |
| | * | Appeal from the United States |
| Defendants - Appellees, | * | District Court for the |
| | * | District of Minnesota. |
| United States of America, et al., | * | |
| | * | |
| Intervenor Defendant Appellees. | * | |

_____

No. 02-3016

_____

| | | |
|---|---|---|
| Gross Seed Company, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| Nebraska Department of Roads, et al., | * | District Court for the |
| | * | District of Nebraska. |
| Defendants - Appellees, | * | |

United States Department of        *
Transportation, et al.,            *
                                   *
    Intervenor Defendant Appellees.   *

_____

Submitted:  May 15, 2003

Filed:  October 6, 2003

_____

Before LOKEN, Chief Judge, FAGG and MURPHY, Circuit Judges.

_____

LOKEN, Chief Judge.

Since 1982, the federal highway statutes have required that ten percent of federal highway construction funds be paid to small businesses owned and controlled by "socially and economically disadvantaged individuals," as that term is defined in § 8(d) of the Small Business Act (15 U.S.C. § 637).  See Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100.  Two non-minority contractors filed these separate actions challenging the current statute and Department of Transportation (DOT) regulations, as implemented in Minnesota and Nebraska.  In the Minnesota action, plaintiff Sherbrooke Turf, Inc. ("Sherbrooke"), sued the Minnesota Department of Transportation (MnDOT) and its Commissioner to enjoin this aspect of the State's federally-assisted highway program.  In the Nebraska action, plaintiff Gross Seed Company ("Gross Seed") sued the Nebraska Department of Roads (NDOR) and its Director.[1]  In each case, with the constitutionality of a federal statute at issue, the United States and DOT intervened as additional defendants.  In the Minnesota action, the Associated General

_____

[1]Eleventh Amendment immunity may bar the claims against MnDOT and NDOR, which are state agencies, but the state officials may be sued for injunctive relief.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-67, 71 n.10 (1989).

Contractors of America and its Minnesota affiliate appeared as amicus on behalf of plaintiff Sherbrooke.

Sherbrooke and Gross Seed provide landscaping services to prime contractors on federally assisted highway projects. In each lawsuit, the district court[2] held that the subcontractor plaintiff has standing to assert its constitutional claims. We agree. The stipulated facts demonstrate that Sherbrooke and Gross Seed have bid on federally assisted highway projects in the past, will continue to bid in the future, and suffer competitive harm when contracts are awarded to others under DOT's Disadvantaged Business Enterprises (DBE) program. See Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 211-12 (1995). Turning to the merits, the district courts concluded that the DBE program as implemented in Minnesota and Nebraska satisfies strict scrutiny review, both facially and as applied, as the Tenth Circuit concluded following the Supreme Court's remand in Adarand. Adarand Constructors, Inc v. Slater, 228 F.3d 1147 (10th Cir. 2000) (Adarand II), cert. granted then dismissed as improvidently granted, 532 U.S. 941, 534 U.S. 103 (2001). Sherbrooke and Gross Seed appeal, arguing the district courts erred in concluding that the federal DBE program satisfies strict scrutiny and in concluding that Minnesota and Nebraska need not establish that their implementation of the DBE program survives independent strict scrutiny review as well. We affirm.

## I. The Legislative Background.

Prior to the 1982 statute designating ten percent of federal highway funds for minority small business contractors, a comparable provision in the Public Works Employment Act of 1977 was upheld in Fullilove v. Klutznick, 448 U.S. 448 (1980).

---

[2]In the Minnesota action, the HONORABLE JAMES M. ROSENBAUM, Chief Judge of the United States District Court for the District of Minnesota. In the Nebraska action, the HONORABLE LYLE E. STROM, United States District Judge for the District of Nebraska.

However, the constitutionality of mandatory set-asides based on racial factors was placed in doubt by later Supreme Court's decisions -- City of Richmond v. J. A. Croson Co., 488 U.S. 469, 498-99 (1989), which struck down the City's thirty percent set-aside for minority small businesses, and Adarand, which held that all government race-based classifications are subject to strict judicial scrutiny. 515 U.S. at 235. Following Adarand, the District of Minnesota invalidated the statutory ten percent set-aside of federal highway funds and DOT's then-existing regulations, "as applied to highway construction contracts in the State of Minnesota." In re Sherbrooke Sodding Co., 17 F. Supp. 2d 1026, 1037-38 (D. Minn. 1998). As a result, the DBE program was suspended in Minnesota in 1999.

In the wake of these judicial decisions, Congress passed the Transportation Equity Act for the 21st Century ("TEA-21"), which continued the ten percent designation subject to DOT implementation. Pub. L. No. 105-178, § 1101(b)(1), 112 Stat. 107, 113. DOT then promulgated the new implementing regulations here at issue in 49 C.F.R. pt. 26. See 64 Fed. Reg. 5096 (Feb. 2, 1999).

The revised DBE program provides contracting advantages to small businesses owned and controlled by "socially and economically disadvantaged individuals." "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). In determining whether a contractor qualifies as a DBE, grantee States must employ a rebuttable presumption that women and members of most racial minority groups are socially and economically disadvantaged. See TEA-21, § 1101(b)(2)(B), 112 Stat. at 113, incorporating 15 U.S.C. § 637(d)(3)(C) and 13 C.F.R. § 124.103(b). An individual

whose personal net worth exceeds $750,000 is not economically disadvantaged. See 49 C.F.R. § 26.67(b). Small businesses do not qualify if their earnings exceeded $16.6 million per year in the previous three fiscal years. TEA-21 § 1101(b)(2)(A), 112 Stat. at 113.

## II. Strict Scrutiny Review.

Sherbrooke and Gross Seed contend that the federal highway DBE program, on its face and as applied in Minnesota and Nebraska, violates the equal protection component of the Fifth Amendment's Due Process Clause. Adarand established that a federal program employing race-based classifications or remedies "must be analyzed by a reviewing court under strict scrutiny." 515 U.S. at 227.[3] Though the DBE program confers benefits on "socially and economically disadvantaged individuals," a term that is facially race-neutral, the government concedes that the program is subject to strict judicial scrutiny, no doubt because the statute employs a race-based rebuttable presumption to define this class of beneficiaries and authorizes the use of race-conscious remedial measures. See Adarand, 515 U.S. at 212-13.[4] Thus, the statute's race-based measures "are constitutional only if they are narrowly tailored to further compelling governmental interests." Grutter v. Bollinger, 123 S. Ct. 2325, 2337-38 (2003). The Court has cautioned courts conducting this review

[3]Although TEA-21 is in part an exercise of Congress's power under the Spending Clause, that does not affect the constitutional analysis. "Congress may employ racial or ethnic classifications in exercising its Spending or other legislative powers only if those classifications do not violate the equal protection component of the Due Process Clause of the Fifth Amendment." Fullilove, 448 U.S. at 480 (plurality opinion); see United States v. Am. Library Ass'n, Inc., 123 S. Ct. 2297, 2303 (2003).

[4]However, the fact that the program is tailored to disqualify minority-owned enterprises that are not truly disadvantaged is relevant to the narrow-tailoring aspect of strict scrutiny analysis. Cf. Adarand, 515 U.S. at 259-62 (Stevens, J., dissenting).

that strict scrutiny is rigorous but not always "fatal in fact." Adarand, 515 U.S. at 237 (quotation omitted).

## A. Compelling Governmental Interest.

To survive strict scrutiny, the government must first articulate a legislative goal that is properly considered a compelling government interest. Neither Sherbrooke nor Gross Seed challenges the district courts' conclusion that Congress and DOT acted to further a compelling interest. As the Tenth Circuit said in Adarand II, "we readily conclude that the federal government has a compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination in the government contracting markets created by its disbursements." 228 F.3d at 1165; accord Croson, 488 U.S. at 492.

In addition to identifying a compelling government interest, the government must demonstrate a "strong basis in the evidence" supporting its conclusion that race-based remedial action was necessary to further that interest. "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." Croson, 488 U.S. at 500. Sherbrooke and Gross Seed argue that Congress lacked strong evidence supporting its conclusion that race-based classifications and remedial measures were necessary. They argue that, in enacting TEA-21, Congress had no "hard evidence" of widespread intentional race discrimination in the contracting industry, relying instead on misrepresentations contained in "Appendix I," a Department of Justice summary of more than fifty documents and thirty congressional hearings on minority-owned businesses prepared in response to the Adarand decision. See Appendix -- The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey, 61 Fed. Reg. 26050 (May 23, 1996). Sherbrooke and Gross Seed point to Government reports and their own expert's report questioning the persistence of racial discrimination in

highway construction and argue that we must conduct a de novo review of this legislative record.

We agree we must take a hard look at the evidence, and we have done so. We conclude that Congress had a strong basis in the evidence to support its conclusion that race-based measures were necessary for the reasons stated by the Tenth Circuit in Adarand II, 228 F.3d at 1167-76. As the Tenth Circuit's analysis demonstrates, Congress has spent decades compiling evidence of race discrimination in government highway contracting, of barriers to the formation of minority-owned construction businesses, and of barriers to entry. In rebuttal, Sherbrooke and Gross Seed presented evidence that the data was susceptible to multiple interpretations, but they failed to present affirmative evidence that no remedial action was necessary because minority-owned small businesses enjoy non-discriminatory access to and participation in highway contracts. Thus, they failed to meet their ultimate burden to prove that the DBE program is unconstitutional on this ground. See Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1317 (Fed. Cir. 2001).

Finally, Sherbrooke and Gross Seed argue that MnDOT and NDOR must independently satisfy the compelling government interest aspect of strict scrutiny review. Under the prior law -- when the ten percent federal set-aside was more mandatory and Fullilove, not strict scrutiny, provided the governing constitutional principle -- the Seventh Circuit held that a contractor who conceded the validity of the federal program could not challenge a grantee State for "merely complying with federal law." Milwaukee County Pavers Ass'n v. Fiedler, 922 F.2d 419, 423 (7th Cir.), cert. denied, 500 U.S. 954 (1991); accord Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 57 (2d Cir.1992); Ellis v. Skinner, 961 F.2d 912, 915 (10th Cir.), cert. denied, 506 U.S. 939 (1992); Tenn. Asphalt Co. v. Farris, 942 F.2d 969, 975 (6th Cir.1991). Based on this precedent, the government argues, and the district courts agreed, that participating States need not independently meet the strict scrutiny standard because under the revised DBE program the State

must still comply with the DOT regulations. Sherbrooke and Gross Seed respond that the prior cases are distinguishable, and Minnesota and Nebraska DBE programs must independently satisfy strict scrutiny under <u>Croson</u>, because the present TEA-21 regime "is characterized by state discretion throughout." This issue was not addressed by the Tenth Circuit in <u>Adarand II</u>.

We conclude that neither side's position is entirely sound. Compelling government interest looks at a statute or government program on its face. When the program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation. Thus, we reject appellants' contention that their facial challenges to the DBE program must be upheld unless the record before Congress included strong evidence of race discrimination in construction contracting *in Minnesota and Nebraska*. On the other hand, a valid race-based program must be narrowly tailored, and to be narrowly tailored, a *national* program must be limited to those parts of the country where its race-based measures are demonstrably needed. To the extent the federal government delegates this tailoring function, a State's implementation becomes critically relevant to a reviewing court's strict scrutiny. Thus, we leave this question of state implementation to our narrow tailoring analysis.

### B. Is the Revised DBE Program Narrowly Tailored?

In addition to determining that a race-based measure serves a compelling government interest, a reviewing court applying strict scrutiny must determine if the measure is narrowly tailored, that is, whether "the means chosen to accomplish the government's asserted purpose [are] specifically and narrowly framed to accomplish that purpose." <u>Grutter</u>, 123 S. Ct. at 2341 (quotation omitted). Sherbrooke and Gross Seed have the ultimate burden of establishing that the DBE program is not narrowly

tailored. See Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 293 (1986) (O'Connor, J., concurring); Rothe, 262 F.3d at 1317. While our compelling interest analysis focused on the record before Congress, the narrow-tailoring analysis looks at the roles of the implementing highway construction agencies.

1. Appellants' facial challenge to the DBE program requires us to look carefully at DOT's regulations to determine whether they may be constitutionally applied under *any* set of factual circumstances. See United States v. Salerno, 481 U.S. 739, 746 (1987) (standard for facial challenges). In determining whether a race-conscious remedy is narrowly tailored, we look at factors such as the efficacy of alternative remedies, the flexibility and duration of the race-conscious remedy, the relationship of the numerical goals to the relevant labor market, and the impact of the remedy on third parties. See United States v. Paradise, 480 U.S. 149, 171, 187 (1987) (plurality and concurring opinions).

Under the revised DBE program, a State receiving federal highway funds must, on an annual basis, submit to DOT an overall goal for DBE participation in its federally funded highway contracts. See 49 C.F.R. § 26.45(f)(1). The overall goal "must be based on demonstrable evidence" as to the number of DBEs who are ready, willing, and able to participate as contractors or subcontractors on federally-assisted contracts. 49 C.F.R. § 26.45(b). The number may be adjusted upward to reflect the State's determination that more DBEs would be participating absent the effects of discrimination, including race-related barriers to entry. See 49 C.F.R. § 26.45(d). The State must meet the "maximum feasible portion" of its overall goal through race-neutral means and must submit for approval a projection of the portion it expects to meet through race-neutral means. See 49 C.F.R. § 26.51(a), (c). If race-neutral means are projected to fall short of achieving the overall goal, the State must give preference to firms it has certified as DBEs. However, such preferences may not include quotas, and set-aside contracts are limited to those instances "when no other method could be reasonably expected to redress egregious instances of

discrimination."  49 C.F.R. § 26.43(b).  During the course of a year, if a State determines that it will exceed or fall short of its overall goal, it must adjust its use of race-conscious and race-neutral methods "[t]o ensure that your DBE program continues to be narrowly tailored to overcome the effects of discrimination."  49 C.F.R. § 26.51(f).

The regulations expressly declare that the statutory ten percent provision "is an aspirational goal at the national level," not a mandatory requirement for grantee States.  49 C.F.R. § 26.41(b).  Thus, absent bad faith administration of the program, a State's failure to achieve its overall goal will not be penalized.  See 49 C.F.R. § 26.47.  If the State meets its overall goal for two consecutive years through race-neutral means, it is not required to set an annual overall goal until it does not meet its prior overall goal for a year.  See 49 C.F.R. § 26.51(f)(3).  In addition, DOT may grant an exemption or waiver from any or all requirements of the program.  See 49 C.F.R. § 26.15(b).

Like the district courts, we conclude that the DOT regulations, on their face, satisfy the Supreme Court's narrow tailoring requirements.  First, the regulations place strong emphasis on "the use of race-neutral means to increase minority business participation in government contracting."  Adarand, 515 U.S. at 237-38 (quotation omitted). "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative," but it does require "serious, good faith consideration of workable race-neutral alternatives."  Grutter, 123 S.Ct. at 2344-45.  The regulations also prohibit the use of quotas and severely limit the use of set-asides. See Croson, 488 U.S. at 496 (discussing quotas).

Second, the revised DBE program has substantial flexibility.  A State may obtain waivers or exemptions from any requirement and is not penalized for a good faith failure to meet its overall goal.  In addition, the program limits preferences to small businesses falling beneath an earnings threshold, and any individual whose net

-10-

worth exceeds $750,000 cannot qualify as economically disadvantaged. See 49 C.F.R. § 26.67(b). Likewise, the DBE program contains built-in durational limits. A State may terminate its DBE program if it meets its annual overall goal through race-neutral means for two consecutive years. 49 C.F.R. § 26.51(f)(3). Moreover, TEA-21 is subject to periodic congressional reauthorization. Periodic legislative debate "assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." Grutter, 123 S.Ct. at 2346 (quotation omitted).

Third, DOT has tied the goals for DBE participation to the relevant labor markets. The regulations require grantee States to set overall goals based upon the likely number of minority contractors that would have received federally assisted highway contracts but for the effects of past discrimination. See 49 C.F.R. § 26.45(c)-(d) (Steps 1 and 2). Though the underlying estimates may be inexact, the exercise requires the States to focus on establishing realistic goals for DBE participation in the relevant contracting markets. This stands in stark contrast to the program struck down in Croson, which "rest[ed] upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." 488 U.S. at 507 (quotation omitted).

Finally, Congress and DOT have taken significant steps to minimize the race-based nature of the DBE program. Its benefits are directed at all small businesses owned and controlled by the socially and economically disadvantaged. While TEA-21 creates a rebuttable presumption that members of certain racial minorities fall within that class, the presumption is rebuttable, wealthy minority owners and wealthy minority-owned firms are excluded, and certification is available to persons who are not presumptively disadvantaged but can demonstrate actual social and economic disadvantage. Thus, race is made relevant in the program, but it is not a determinative factor. See Grutter, 123 S.Ct. at 2345-46; Gratz v. Bollinger, 123 S.Ct. 2411, 2429 (2003) (criticizing a University of Michigan program that automatically

-11-

awarded twenty points to minority applicants, without individualized consideration).

For these reasons, we agree with the district courts that the revised DBE program is narrowly tailored on its face.

2. Sherbrooke and Gross Seed also argue that the revised DBE program as applied in Minnesota and Nebraska is not narrowly tailored. As noted previously, because the revised DBE program affords grantee States substantial discretion, this contention requires us to examine the program as implemented by those States. Under the revised federal program, States "set their own goals, based on local market conditions; their goals are not imposed by the federal government nor do recipients have to tie them to any uniform national percentage." 64 Fed. Reg. at 5102.

**Minnesota.** Following promulgation of the current DOT regulations, MnDOT commissioned National Economic Research Associates (NERA) to study the highway contracting market in Minnesota. NERA first determined that DBEs made up 11.4 percent of the prime contractors and subcontractors in the highway construction market. See 49 C.F.R. § 26.45(c) (Step 1). Of this number, 0.6 percent were minority-owned and 10.8 percent women-owned. Based upon its analysis of business formation statistics, NERA next estimated that the number of participating minority-owned businesses would be 34 percent higher in a race-neutral market. Therefore, NERA adjusted its DBE availability figure from 11.4 to 11.6 percent. See 49 C.F.R. § 26.45(c) (Step 1). Based on NERA's study, MnDOT adopted an overall goal of 11.6 percent DBE participation for federally assisted highway projects in fiscal year 2001. MnDOT predicted that it would need to meet nine percent of that overall goal through race- and gender-conscious means, based on the fact that DBE participation in state highway contracts dropped from 10.25 percent in 1998 to 2.25 percent in 1999, when its previous DBE program was suspended by the district court's injunction in Sherbrooke. To meet its overall goal, MnDOT required each prime contract bidder to make a good faith effort to subcontract a prescribed portion of the

-12-

project to DBEs. MnDOT determines that portion based on several individualized factors, including the availability of DBEs and the extent of subcontracting opportunities on the project.

DOT approved this MnDOT program for Fiscal Year 2001. Sherbrooke presented evidence attacking the reliability of the data NERA used in determining its recommended overall goal. But Sherbrooke failed to establish that better data was available or that MnDOT was otherwise unreasonable in undertaking this thorough analysis and in relying on its results. The precipitous drop in DBE participation in 1999, when no race-conscious methods were employed, supports MnDOT's conclusion that a substantial portion of its 2001 overall goal could not be met with race-neutral measures, and there is no evidence that MnDOT failed to adjust its use of race-conscious and race-neutral methods as the year progressed, as the DOT regulations require. On this record, we agree with the district court that the revised DBE program serves a compelling government interest and is narrowly tailored, on its face and as applied in Minnesota. Accordingly, the court properly granted summary judgment dismissing Sherbrooke's claims.

**Nebraska.** To implement the revised federal DBE program, NDOR commissioned MGT of America, Inc., to conduct availability and capability studies of DBE firms in the Nebraska highway construction market. The availability study found that between 1995 and 1999, when Nebraska followed the then-mandatory ten percent set-aside requirement, 9.95 percent of all available and capable firms were DBEs, and DBE firms received 12.67 percent of the contract dollars on federally assisted projects. After apportioning part of this DBE contracting to race-neutral contracting decisions, MGT recommended that NDOR set an overall goal of 9.95 percent DBE participation and predict that 4.82 percent of this overall goal would have to be achieved by race- and gender-conscious means. NDOR adopted these recommendations in its submission to DOT for Fiscal Year 2001. NDOR required that prime contractors make a good faith effort to allocate a set portion of each

contract's funds to DBE subcontractors. DOT approved this NDOR program for fiscal year 2001. Having carefully reviewed the trial record, we conclude that Gross Seed, like Sherbrooke, failed to prove that the revised DBE program is not narrowly tailored as applied in Nebraska. Accordingly, the district court properly entered post-trial judgment dismissing Gross Seed's claims.

The judgments of the district courts are affirmed.

_____