**ROTHE DEVELOPMENT CORPORATION, Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF DEFENSE and United States Department of the Air Force, Defendants–Appellees.**

No. 00–1171.

United States Court of Appeals, Federal Circuit.

Aug. 20, 2001.

David F. Barton, The Gardner Law Firm, of San Antonio, TX, argued for plaintiff-appellant. With him on the brief were R. Wes Johnson, and Kevin M. Warburton.

Gregory B. Friel, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief was Mark L. Gross, Attorney.

John G. Roberts, Jr., Hogan & Hartson L.L.P., of Washington, DC, for amicus curiae The Associated General Contractors of America, Inc. With him on the brief were David G. Leitch, and H. Christopher Bartolomucci. Of counsel on the brief was Michael E. Kennedy, General Counsel, The Associated Contractors of America, Inc., of Alexandria, VA.

John H. Findley, Pacific Legal Foundation, of Sacramento, CA, for amicus curiae Pacific Legal Foundation.

Philip Allen Lacovara, Mayer, Brown & Platt, of New York, NY, for amici curiae Asian American Legal Defense and Education Fund, Et. Al. With him on the brief were Norman R. Williams, II, and Andrew H. Schapiro. Of counsel was Carolyn B. Greenwald.

Before MICHEL, CLEVENGER, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

This federal contract case concerns the constitutionality of § 1207 of the National Defense Authorization Act of 1987 ("the 1207 program"), Pub.L. No. 99–661, 100 Stat. 3859, 3973 (1986) (as amended), codified at 10 U.S.C. § 2323 (1994), which permits the United States Department of Defense ("DOD") to preferentially select bids submitted by small businesses owned by socially and economically disadvantaged individuals ("SDBs"). The 1207 program operates by increasing the bid of a non-minority-owned firm by up to ten percent via a mechanism called a "price-evaluation" adjustment. Rothe Development Corporation ("Rothe") appeals the April 27, 1999 decision of the United States District Court for the Western District of Texas granting summary judgment in favor of the government that the 1207 program is constitutional, as enacted and as applied in this case in which Rothe lost an Air Force contract to a SDB due to application of the 1207 program. *Rothe Dev. Corp. v. United States Dep't of Defense*, 49 F.Supp.2d 937, 953 (W.D.Tex.1999) ("*Rothe I*"). In reviewing the program, the district court applied a deferential standard of review, and relied extensively on evidence post-dating the reauthorization of the 1207 program collected in an amicus brief filed on behalf of the government, and in a 1998 government study. Rothe contends that the 1207 program violates its equal protection rights under the Due Process Clause of the Fifth Amendment to the United States Constitution, because the program lacks the evidentiary foundation required to justify the enactment and application of a race-based classification. In defending the program, the government argues that Congress had sufficient evidence from which to conclude that the DOD had at least been a "passive participant" in perpetuating the lingering effects of past, private discriminatory conduct that significantly handicapped minorities from obtaining defense contracts, such that race-based remedial relief was justified, and moreover, that the 1207 program was narrowly tailored in addressing this remedial need. The government also argues that evidence post-dating the program's last reauthorization in 1992 justified the program even if we find that the pre-reauthorization evidence alone was insufficient. Because we conclude that the district court improperly applied a deferential legal standard rather than "strict scrutiny," and also impermissibly relied on post-reauthorization evidence to support the program's constitutionality as reauthorized, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## Background

### A. The 1207 Program

#### 1. Purpose and History of the 1207 Program

Congress enacted the 1207 program to "ensure that substantial progress is made in increasing awards of [DOD] contracts to section 1207(a) entities." Pub.L. No. 100–180, § 806(a), 101 Stat. 1019, 1126 (1987). First enacted by Congress for fiscal years 1987 through 1989, § 1207 sets a "goal" that five percent of the total dollar amount obligated for defense contracts and subcontracts for each fiscal year would be awarded to businesses that 1) are "small"; and 2) are "owned and controlled by" socially and economically disadvantaged individuals. 10 U.S.C. § 2323(a)(1)(A). The five percent goal is a department-wide goal that is not segmented by industry categories.[1] H.R. Conf. Rep. No. 101–331 at 614, *reprinted in* 1989 U.S.C.C.A.N. 977, 1071. The relevant statutory language provides:

a. Goal.—(1) Except as provided in subsection (d), a goal of 5 percent of the amount described in subsection (b) shall be the objective of the Department of Defense ... in each fiscal year for the total combined amount obligated for contracts and subcontracts entered into with—

A. small business concerns ... owned and controlled by socially and economically disadvantaged individuals

(as such term is used in section 8(d) of the Small Business Act (15 U.S.C. § 637(d)) and regulations issued under that section). ...

10 U.S.C. § 2323(a)(1)(A). In order to meet the goal, regulations promulgated pursuant to § 1207 authorized the DOD to raise the bids of non-SDB bidders by as much as ten percent above the fair market price per contract.[2] 48 C.F.R. subpart 219.10 (1997); *id.* §§ 252.219–7000 & –7006.[3]

The 1207 program was initially enacted as a three-year pilot program. In 1989, Congress extended the program from 1990 until 1993, with the hope that the "additional three years [would] provide the [DOD], and the defense industry, with the opportunity to vigorously pursue the program's fundamental objective: to expand the participation of disadvantaged small business concerns ... in the defense marketplace." H.R.Rep. No. 101–331, at 614, *reprinted in* 1989 U.S.C.C.A.N. 977, 1071; Pub.L. No. 101–189, § 831(b), 103 Stat. 1352, 1507 (1989). Despite the continuation of the program beyond its initial period of authorization, in the first five years of the program, the DOD did not meet the goal of increasing participation by SDBs to five percent of its total dollar amount allocated for contracts and subcontracts. As a result, in 1992, Congress reauthorized the program for seven more years, through

---

1. The bill passed by the House contained a provision mandating that ten percent of each of the amounts appropriated for the DOD in procurement, research, development, test and evaluation, military construction, and operations and maintenance be set-aside for SDBs. H.R. Conf. Rep. No. 99–1001, at 524, *reprinted in* 1986 U.S.C.C.A.N. 6529. The Senate bill, which became law, replaced the mandated ten percent set-aside with a "goal" that five percent of the total combined amount of contracts and subcontracts let by the DOD be awarded to SDBs. *Id.*

2. The statute authorizes several approaches to attaining the five percent goal, such as technical assistance, modification of competitive procedures, advance payments, and contracting with historically minority educational institutions. 10 U.S.C. §§ 2323(a), (c), (e).

3. To be consistent with the district court opinion and the practice of the parties, all citations related to the 1207 program are, unless otherwise noted, to regulations as they existed and were codified at the time of contract solicitation. Many of these regulations and statutes have been modified since.

fiscal year 2000. Pub.L. No. 102–484, § 801(a)(1)(B), 106 Stat. 2315, 2442 (1992). In every year since the 1992 reauthorization, the DOD has met the five percent goal. In 1997, for instance, the Air Force awarded at least 9.7 percent of its total eligible contract dollars to SDBs.

In 1998, Congress amended the 1207 program to require the DOD to suspend the use of the price-evaluation adjustment for one year after any fiscal year in which the DOD awards more than five percent of its eligible contract dollars to SDBs. Pub.L. No. 105–261, § 801, 112 Stat.1920, 2080–81 (1998). Because the DOD met the five percent goal in both fiscal years 1998 and 1999, the DOD suspended the ten percent preference for those last two calendar years. In 1999, Congress reauthorized the 1207 program for three more years. Pub.L. No. 106–65, § 808, 113 Stat. 512, 705 (1999). Without congressional reauthorization, the 1207 program will expire at the end of fiscal year 2003.

### 2. Requirements of the 1207 Program

The race-based preference program challenged in this case was established pursuant to § 1207, and incorporated portions of the Small Business Act ("Act"), 15 U.S.C. §§ 637(d) and 644(g) (1994). Section 1207 references § 8(d) of the Act, as amended, 15 U.S.C. § 631 (1994), *et seq.*, to define a SDB according to the racial or ethnic background of the controlling owner. 10 U.S.C. § 2323(a)(1)(A); 15 U.S.C. § 637(d). A business is "small" if it is independently owned and operated, if it is not dominant in its field of operation, and if its number of employees or annual gross receipts fall below predetermined levels. 15 U.S.C. § 632(a)(1) (1994). The Act defines "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically disadvantaged individuals" are defined as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). Under the Act, five groups (comprising thirty-seven subgroups), including Asian Pacific Americans, are presumed to be socially and economically disadvantaged.[4] 15 U.S.C. § 637(d)(3)(C). A member of such a group is deemed to own and control a SDB if he or she owns at least fifty-one percent of the business, and controls management and daily operations. 15 U.S.C. § 637(d)(3)(C)(i)(ii). Regulations promulgated pursuant to the statute provide that either a contracting officer, an unsuccessful bidder, or the Small Business Administration ("SBA") may challenge an individual's presumptive status as socially or economically disadvantaged. 48 C.F.R. § 219.302–70 (1997). Bidding SDBs may elect to waive the price-evaluation adjustment. 48 C.F.R. § 219.7002(a).

---

4. The groups included are the following: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian–Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, the Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); and Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal). 13 C.F.R. part 124.103(b) (1998).

Section 1207 and its implementing regulations impose a number of requirements in order for SDBs to participate in the program. Under regulations promulgated pursuant to the statute, an owner of a SDB must have a net personal worth of less than $750,000, excluding the value of his or her place of business and personal residence. 13 C.F.R. § 124.106(b)(2) (1998). Moreover, individuals who are not members of the presumptively disadvantaged groups can nevertheless be entitled to application of the price-evaluation adjustment to bids of competitors provided they demonstrate that they have been socially or economically disadvantaged because of their "color, ethnicity, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar cause not common to small business persons who are not socially disadvantaged." 13 C.F.R. § 124.105(c)(1)(i) (1998).

### B. The Contract at Issue

Rothe is based in San Antonio, Texas, and is owned by Ms. Suzanne Patenaude, a Caucasian female. Since 1987, Rothe had contracted with the Department of the Air Force to maintain, operate, and repair the computer systems of the Switchboard Operations and Network Control Center ("NCC") at Columbus Air Force Base in Mississippi. Korean–Americans David and Kim Sohn of Baltimore, Maryland, own and operate International Computer and Telecommunications, Inc. ("ICT"), a SDB with annual revenues of approximately $13 million. ICT also performs computer maintenance and repair work and was Rothe's "number one competitor."

In an effort to improve contractor accountability and quality, the Air Force decided to consolidate Rothe's Switchboard/NCC contract with a contract for Base Telecommunications Services ("BTS"). On March 6, 1998, the 38th Engineering Installation Wing at Tinker Air Force Base, Oklahoma, issued a solicitation for competitive bids on the combined contract, and announced that, unlike predecessor contracts, the proposed contract would be let pursuant to the 1207 program. Five contractors submitted bids. Two bidders were SDBs. Rothe, which was not a SDB, bid $5.57 million, and was the lowest bidder. ICT, which was a SDB and thus could participate in the 1207 program, bid $5.75 million. Through application of the price-evaluation adjustment, Rothe's bid was increased to $6.1 million for purposes of the bid selection. On August 20, 1998, the Air Force awarded the contract to ICT, the "fictionally" lowest bidder. According to the district court, the parties agree that Rothe lost the bid only because of application of the price-evaluation adjustment. *Rothe I*, 49 F.Supp.2d at 941.

The contract in this case was scheduled to expire on September 30, 1999. However, the Air Force exercised an option to extend ICT's contract through September 30, 2001. ICT has not performed any work under the disputed contract since April 30, 1999, however, because first the United States Court of Appeals for the Fifth Circuit and later this court imposed a stay pending resolution of this appeal. As a consequence, the Air Force issued a new solicitation for the work covered by the disputed contract. Thus, the lawfulness of the award of the contract to ICT is not at issue.

### C. Procedural History

On November 5, 1998, Rothe brought suit against the DOD and the United States Department of the Air Force, challenging the constitutionality of the 1207 program both as enacted and as applied under the equal protection component of the Fifth Amendment's Due Process Clause. Rothe sought declaratory and injunctive relief barring award of the con-

tract and continued application of the 1207 program to future contracts, and monetary damages to compensate it for its bid preparation costs and attorney fees. On November 25, 1998, the United States District Court for the Western District of Texas denied Rothe's motion for a preliminary injunction. On February 26, 1999, the parties filed cross-motions for summary judgment. On April 27, 1999, the district court granted summary judgment in favor of the government and entered its judgment. (*Rothe I* ).

Rothe filed a timely notice of appeal to the United States Court of Appeals for the Fifth Circuit. The government moved to dismiss for lack of subject matter jurisdiction. *Rothe Dev. Corp. v. United States Dep't of Defense,* 194 F.3d 622 (5th Cir. 1999) ("*Rothe II* "). On October 27, 1999, the Fifth Circuit granted the government's motion, holding that it lacked jurisdiction over the appeal, but instead of dismissing the appeal, transferred it to this court. *Id.* at 626. We heard oral argument in this case on November 8, 2000.

## Analysis

### A. Standard of Appellate Review

■ We review a district court's grant of summary judgment *de novo.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating the grant of a motion for summary judgment, our task is to discern whether "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In this case, however, the issues are ones of law based on underlying facts that are essentially undisputed. What is sharply disputed are the inferences and conclusions that may properly be drawn from those underlying facts.

### B. Jurisdiction

■ Under 28 U.S.C. § 1295(a)(2) (1994), this court has exclusive jurisdiction to hear appeals and decide all issues raised in cases in which the district court's subject matter jurisdiction is "based, in whole or *in part,*" on the Tucker Act, 28 U.S.C. § 1346(a)(2) (1994) (emphasis added). The Tucker Act confers on district courts original jurisdiction, concurrent with that of the United States Court of Federal Claims, over "[a]ny . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* Under the Tucker Act, an unsuccessful bidder can recover its bid preparation costs from the government on the theory that failure to evaluate a "bid honestly and fairly" breaches an implied-in-fact contract of fair dealing. *Coflexip & Servs., Inc. v. United States,* 961 F.2d 951, 952–53 (Fed.Cir.1992). As a suit to recover its bid preparation costs, Rothe's complaint invoked the Tucker Act. Thus, this court has exclusive jurisdiction over all issues Rothe raises in this appeal. Therefore, we will not return the appeal to the Fifth Circuit and will address all issues properly raised.

## C. Burden of Proof

As a preliminary matter, we must address whether the district court correctly allocated the burden of proof. Rothe argues that the district court erred in placing the burden on Rothe to prove that the price-evaluation adjustment was unconstitutional. Citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("*Adarand III*"), Rothe contends that it is the governmental actor that must justify its use of an affirmative action program. *Rothe I*, 49 F.Supp.2d at 945.

■■■ We believe the district court correctly placed the burden of proof on Rothe to demonstrate that the program was unconstitutional. Before a court can assess whether a plaintiff has met his or her burden of proof, however, the court must review the government's evidentiary support to determine whether the legislative body had a "strong basis in evidence" to believe that remedial action based on race was necessary. *Wygant v. Jackson Bd. of Ed., Inc.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality op.). Thus, the government bears the burden to produce evidence, *i.e.*, the burden of going forward with evidence. The challengers, however, "continue to bear the ultimate burden of persuading the court that the [entity's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently 'narrowly tailored.'" *Id.* at 293, 106 S.Ct. 1842 (O'Connor, J., concurring).

## D. Legal Standard for Reviewing Federal Race Based Classifications

### 1. Congress' Authority to Enact Race Based Classifications

■■■ Congress' authority to enact race-based classifications flows from either of two distinct sources of congressional power. Under Article I of the United States Constitution, Congress can attach race-based conditions when it appropriates for a federal program. When it enacts legislation pursuant to Article I, it is free to attach any race-based condition so long as it does so without violating the equal protection component of the Fifth Amendment's Due Process Clause.[5] *See Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

■■■ Additionally, § 5 of the Fourteenth Amendment gives Congress a separate and distinct source of authority to enact remedial racial classifications.[6] Section 5 is a "positive grant of legislative power" to Congress, *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), that is limited to congressional remedial action against the state and state actors, not private individuals. *See e.g., Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 964, 148 L.Ed.2d 866 (2001) ("Congress' § 5 authority is appropriately exercised only in response to state transgressions."). Nor does it apply against federal actors. The limits placed on Congress when it enacts a program under § 5 have not been clearly defined, as the Supreme Court has expressly declined to decide

---

**5.** Although the Fifth Amendment does not contain an express equal protection clause, the Supreme Court has read into the Fifth Amendment's Due Process Clause an equal protection component. *See Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable

as to be violative of due process.'") (internal citation omitted).

**6.** Section 5 of the Fourteenth Amendment states: "Congress shall have the power to enforce, by appropriate legislation, the provisions of this Article." U.S. Const., Amend. XIV, § 5. Section 1 of the Fourteenth Amendment, of course, prohibits discrimination by the states.

whether deference applies. *See Adarand III*, 515 U.S. at 230, 115 S.Ct. 2097 (noting that justices have taken "different views" on the "extent to which courts should defer to Congress' exercise of [its § 5] authority," but that the Court declined to address those differences).

The 1207 program was enacted pursuant to Congress' Article I powers to appropriate funds for the Armed Forces, and is a program that affects private firms that submit bids to contract with the DOD. *See Metro Broadcasting Inc. v. FCC*, 497 U.S. 547, 605–06, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting) (rejecting the argument that § 5 applies to federal programs administered by federal officials). Thus, in determining whether the 1207 program is constitutional, we must review the governing case law to determine the limits the Fifth Amendment places on congressional power to enact racial classifications under Article I. We do not, and need not, decide the proper analysis for cases involving Congress' power under § 5 of the Fourteenth Amendment.

2. The Fifth Amendment as a Limit on Congressional Power to Enact Race–Based Classifications

Prior to 1995, the Supreme Court applied a *different* standard of review depending upon the constitutional basis for enacting the classification. If the program was enacted by a state or municipality, and thus subject to the limits of § 1 of the Fourteenth Amendment, the Court applied the highest level of review—"strict scrutiny." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[7] Determining whether a racial classification satisfied strict scrutiny required an inquiry into whether the "suspect classification" (i.e., race) served a "compelling interest" and was "narrowly tailored" in furtherance of that interest. *Id.*

Initially, however, the Supreme Court construed the limits placed on federal programs under the Fifth Amendment (and thus applicable to federal programs enacted under Article I) to be different than those under the Fourteenth Amendment (applicable to states and municipalities). Until 1995, race-based classifications enacted by the federal government were subject to middle-tier scrutiny—"intermediate scrutiny"—whereby the classification would satisfy constitutional requirements if it was "substantially related" to an "important" governmental objective. *Metro Broadcasting*, 497 U.S. at 565–66, 110 S.Ct. 2997.[8]

■ In 1995, in *Adarand III*,[9] a case involving the constitutionality of a federal

7. In *Croson*, the city of Richmond, Virginia, adopted a Minority Business Utilization Plan in response to claims that the city had discriminated on the basis of race in the letting of city contracts, or at least that prime contractors had discriminated against minority subcontractors. *Croson*, 488 U.S. at 469, 109 S.Ct. 706.

8. In *Metro Broadcasting*, the Court considered the constitutionality of two minority preference programs adopted by the Federal Communications Commission. *Metro Broadcasting*, 497 U.S. at 552, 110 S.Ct. 2997.

9. Like the 1207 program, the program at issue in *Adarand* was also enacted by Congress.

At issue in the case was the constitutionality of the Subcontractor Compensation Clause ("SCC"), which employed race-conscious presumptions designed to favor minority enterprises and other "disadvantaged business enterprises" ("DBEs"). *Adarand III*, 515 U.S. at 209, 115 S.Ct. 2097. In the case, the Central Federal Lands Highway Division, which is part of the Department of Transportation ("DOT"), awarded a prime contract for a highway construction program in Colorado to Mountain Gravel & Construction Company. *Id.* at 205, 115 S.Ct. 2097. Mountain Gravel solicited bids from subcontractors for the guardrail portion of the contract. *Id.* Adarand, a Colorado-based highway construction company, submitted the lowest bid, but the

racial classification enacted under Article I, a 5–4 majority of the Court definitively held that *all* racial classifications—whether they be enacted by a state, a municipality, or the federal government—are subject to the *strictest* judicial scrutiny.[10] *Adarand III*, 515 U.S. at 224, 115 S.Ct. 2097 (holding that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny") (emphasis added). While the *Adarand III* Court did not detail the precise analysis to apply to a federal racial classification,[11] the Court's express abandonment of prior case law applying different and less rigorous levels of scrutiny to federal racial classifications left no doubt that the Court intended there

to be only one kind of strict scrutiny, applied with the same level of rigor to both state/municipal racial classifications and federal racial classifications enacted under Congress' Article I power. *Id.* at 225, 115 S.Ct. 2097 (abandoning the *Metro Broadcasting* approach because such approach had "repudiated the long-held notion that 'it would be unthinkable that the same Constitution would impose a *lesser duty* on the Federal Government' than it does on a State to afford equal protection of the laws") (internal citation omitted) (emphasis added); *id.* at 235, 115 S.Ct. 2097 (noting that the *Fullilove* approach applying intermediate scrutiny to federal racial classifications was "no longer controlling" to the extent it would hold federal racial classifications "to a less rigorous standard") [12] (emphasis added).

contract was awarded to a construction company owned by an Hispanic American. *Id.* The United States Court of Appeals for the Tenth Circuit had initially affirmed the district court's decision upholding the constitutionality of the program. *Adarand Constructors, Inc. v. Pena*, 16 F.3d 1537 (10th Cir. 1994) (*"Adarand II"*). The Supreme Court reversed and remanded. *Adarand III*, 515 U.S. at 227, 115 S.Ct. 2097. On remand, the district court held the SCC program unconstitutional, finding that it was not narrowly tailored. *Adarand Constructors, Inc. v. Pena*, 965 F.Supp. 1556 (D.Colo.1997) (*"Adarand IV"*). On September 25, 2000, the Tenth Circuit held that there was evidence that Congress had a compelling interest in enacting the SCC program; the court also held that while the challenged 1996 SCC program was not narrowly tailored, the current program is narrowly tailored. *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir.2000) (*"Adarand VII"*). On March 26, 2001, the Supreme Court granted certiorari to hear *Adarand VII. Adarand Constructors, Inc. v. Slater*, —— U.S. ——, 121 S.Ct. 1598, 149 L.Ed.2d 464, 2001 WL 369474 (2001). The writ was limited to two questions: (1) "Whether the court of appeals misapplied the strict scrutiny standard in determining if Congress had a compelling interest to enact legislation designed to remedy the effects of racial discrimination"; and (2) "Whether the United States Department of Transportation's cur-

rent [DBE] program is narrowly tailored to serve a compelling governmental interest." *Id.* (as amended on April 13, 2001).

10. The Supreme Court's opinion in *Adarand III* is a majority opinion as to all parts, except to Part III C, which is a plurality opinion authored by Justice O'Connor and only joined by Justice Kennedy. All references to *Adarand* are to the majority opinion, except where noted.

11. The *Adarand* Court declined to explicate the precise analysis applicable to a federal racial classification. Instead, the Court vacated the decision of the United States Court of Appeals for the Tenth Circuit and remanded the case "for further consideration in light of the principles we have announced." *Adarand III*, 515 U.S. at 237, 115 S.Ct. 2097.

12. In *Fullilove*, the Court applied intermediate scrutiny to a racial classification enacted by Congress pursuant to its powers under § 5 of the Fourteenth Amendment. Chief Justice Burger, writing for the plurality, said that a program enacted by Congress warranted deferential review: "A program that employs racial or ethnic criteria, even in a remedial context, calls for close examination; yet we are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution to ...

Moreover, the Court's reference to its historical practice of applying Fourteenth Amendment precedent to Fifth Amendment equal protection problems provides a clear indication that it is the *Croson* analysis—applied earlier to state and municipal classifications—that provides the benchmark for judging the constitutionality of a federal racial classification. *Id.* at 217, 115 S.Ct. 2097 (noting that "[i]n case after case, [F]ifth [A]mendment equal protection problems are discussed on the assumption that [F]ourteenth [A]mendment precedents are controlling") (citing Karst, *The Fifth Amendment's Guarantee of Equal Protection*, 55 N.C. L.Rev. 541, 554 (1977)); *see also id.* at 223, 115 S.Ct. 2097 (noting that even after *Metro Broadcasting*, the Court "indicated that *Croson* had at least some bearing on federal race-based action when it vacated a decision upholding such action and remanded for further consideration in light of *Croson*") (citing *H.K. Porter Co. v. Metro. Dade County*, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989)); *id.* (citing *Mann v. Albany*, 883 F.2d 999, 1006 (11th Cir.1989) ("*Croson* 'may be applicable to race-based classifications imposed by Congress.'")).

**E. Analysis of the Legal Standard Applied by the District Court**

Although acknowledging that strict scrutiny must be applied in reviewing a federal racial classification, the district court in this case opined that Congress, unlike states or municipalities, should be given deference both "in articulating a compelling purpose ... [and in showing] that its action is narrowly tailored to that purpose." *Rothe I*, 49 F.Supp.2d at 949; *see also id.* (noting that "[i]f Congress is

to be allowed a broad vision of the nation's problems, it seems only logical that it be allowed some measure of deference in addressing those problems"); *id.* at 950 (noting that "deference should be given to congressional findings that discrimination has continued and must be addressed"). In applying this deferential scrutiny, the district court expressly declined to conduct a *Croson*-like analysis of the 1207 program. *Id.* at 949 (stating that federal racial classifications should not be "rigidly held to the standards set forth in *Croson*"); *see also id.* (noting that the narrow tailoring factors discussed in *Croson* should not be "applied in lockstep conformity with *Croson*"); *id.* at 953 (arguing that "*Croson's* mandate that a *local* government make specific findings regarding specific minorities in specific industries" should not be applied "without alteration, to the acts of Congress") (emphasis in original).

The district court supported its approach by relying exclusively on language in two Supreme Court plurality opinions, both discussing Congress' remedial powers under § 5 of the Fourteenth Amendment, not the limits imposed by the Fifth Amendment on the exercise of its Article I appropriating powers. *Id.* at 943–44. The district court noted that in both the *Fullilove* and *Croson* plurality opinions, certain members of the Court had indicated that since Congress enjoyed a "more comprehensive remedial power" than other governmental bodies with which to enforce equal protection guarantees, its findings would be entitled to greater deference than those of a state or municipal legislative body.[13] *Id.* at 943 (citing *Ful-*

'enforce, by appropriate legislation,' the equal protection guarantees of the Fourteenth Amendment." *Fullilove*, 448 U.S. at 472, 100 S.Ct. 2758.

**13.** Although Justice O'Connor authored the majority opinion in *Croson*, there are two

separate parts of the opinion to which only a plurality joined: 1) Part II which was joined by Chief Justice Rehnquist and Justice White; and 2) Parts III A and V, joined by Chief Justice Rehnquist, and Justices White and Kennedy.

*lilove,* 448 U.S. at 483, 100 S.Ct. 2758); *see also id.* at 944 (noting that in *Croson,* Justice O'Connor, when writing for only a plurality, had allegedly "affirmed the Court's deference to federal programs," when she observed that "Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment") (citing *Croson,* 488 U.S. at 490, 109 S.Ct. 706 (plurality op., O'Connor, J.)). *Adarand III,* the district court said, had left undisturbed the various justices' previously expressed views on Congress' remedial power. The district court noted that in *Adarand III,* "Justice O'Connor, again writing for only a plurality of the Court, merely acknowledged that the Court as a whole had not yet come to terms with the question of what deference to give congressional remedial actions." *Id.* The district court thus opined that since "no justice on the Court" had "repudiated ... his or her previously expressed views on the subject," *id.* at 944 (citing *Adarand III,* 515 U.S. at 231, 115 S.Ct. 2097), "a simple headcount assures this court that a majority of the Supreme Court, including Justice O'Connor and the four dissenters in *Adarand,* would favor some standard that allowed Congress a broader brush than it would allow the states with which to design remedial measures for the purpose of addressing nationwide discrimination." *Id.* In fashioning this broader brush, the district court concluded that it need not scrutinize as rigorously Congress' conclusion that remedial action was necessary and that it was narrowly tailored. *Id.* at 946.

We hold that the district court erred in concluding that federal racial classifications should be reviewed under a deferential analysis that is not applicable to state or municipal classifications. Indeed, as Justice O'Connor noted in *Adarand III,* creating a distinction between state and federal racial classifications "lacks support" in Supreme Court precedent and "undermines the fundamental principle of equal protection as a personal right." *Adarand III,* 515 U.S. at 235, 115 S.Ct. 2097 (plurality op., O'Connor, J.). In effect, the district court appears to have discerned in the plurality and dissenting opinions a basis to apply to federal programs a watered-down version of strict scrutiny as articulated in *Croson.* We reject the notion of lesser scrutiny, which seems suspiciously like the middle-tier scrutiny of *Metro Broadcasting.* While the district court may be correct that Congress may be owed deference when it legislates pursuant to § 5, that issue is not before us today. The 1207 program was enacted pursuant to Article I, and so, as set forth in *Adarand III,* Congress isentitled to no deference in determining whether Congress had a compelling interest in enacting the racial classification, and that the classification was narrowly tailored in fulfillment of that interest.[14] On remand, thus, the district court should undertake the same type of detailed, skeptical, nondeferential analysis undertaken by the *Croson* Court, but specifically account for the factual differences between this program and that at issue in *Croson. Id.* at 228, 115 S.Ct. 2097 (noting that strict scrutiny requires taking "relevant differences into account"). Adopting the strict scrutiny analysis to the specific facts at issue in a case, however, must not result in a lesser degree of scrutiny than was required by

---

14. That Congress is entitled to no deference in its ultimate conclusion that race-based relief is necessary does not mean that Congress is entitled to no deference in its factfinding. *See Croson,* 488 U.S. at 500, 109 S.Ct. 706 ("The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary.").

the Court in *Croson*. Strict scrutiny is a single standard and must be followed here.

## F. Pre Reauthorization Evidence

 The district court admittedly engaged in only a cursory analysis of the evidence before Congress at the time of the reauthorization of the 1207 program, choosing instead to focus primarily on post-reauthorization evidence. Because the reauthorization of the 1207 program in 1992 constitutes a new statute, the district court need only have considered whether there was a compelling interest in reauthorizing the 1207 program in 1992; it is irrelevant for purposes of this case whether the original statute fails for want of a sufficient factual predicate.[15] As to the pre-reauthorization evidence, the district court merely set forth a list of reports and other materials that Congress apparently had before it during the initial enactment and last reauthorization of the 1207 program. To support its conclusion that Congress had a compelling interest in enacting the 1207 program, the district court cited three congressional documents. *Rothe I*, 49 F.Supp.2d at 946 (citing 131 Cong. Rec. 17,445 (1985); 131 Cong. Rec. 21,714 (1986); Small Disadvantaged Business Preauthorization, Hearing Before the Investigative Subcommittee of the House Committee on Armed Services, 102d Cong., 2d Sess. 53 (1992)). The district court also cited four congressional docu-

ments relating to enactment of a separate minority advantage program, the § 8(a) program.[16] *Id.* (citing H.R.Rep. No. 468, 94th Cong., 1st Sess. 2 (1975) (only three percent of American businesses were owned by minorities, while minorities made up sixteen percent of the population); Congressional Research Service, Minority Enterprise and Public Policy, 52–53 (June 9, 19[7]7) (SBA's success in aiding disadvantaged firms described as "minimal"); Small and Minority Business in the Decade of the 1980s, 97th Cong., 1st Sess. 10, 33–34, 220 (1981); and H.R.Rep. No. 460, 100th Cong., 1st Sess. 18 (1987)). To support its conclusion that Asian Pacific Americans had been discriminated against, the district court referenced findings by the Small Business Administration ("SBA"), made prior to Congress' inclusion of Asian Pacific Americans in the SBA's presumption in 1980. *Rothe I*, 49 F.Supp.2d at 946; *see also* Pub.L. No. 95–507, § 201, 92 Stat. 1757 (1978); Pub.L. No. 96–302, § 118(a), 94 Stat. 833 (1980), codified at 15 U.S.C. § 631(f)(1) (1994).

 Under *Croson*, in order to determine whether a racial classification is constitutional, a reviewing court must be satisfied that a "strong basis in evidence" supports the legislature's conclusion that discrimination persisted and remedial action was needed. *Croson*, 488 U.S. at 500, 109 S.Ct. 706 (citing *Wygant*, 476 U.S. at

---

**15.** We recognize that a governmental body reauthorizing an edict—for example, Congress reauthorizing a statute—has the opportunity to inspect all evidence post-dating enactment but pre-dating reauthorization. That is, for the purpose of considering congressional motivation, the process of reauthorization is equivalent to simultaneously allowing a statute to lapse and re-enacting it. Therefore, in assessing the constitutionality of a statute in an equal protection context, a reviewing court should be able to consider all evidence available to Congress pre-dating the most recent reauthorization of the statute at issue.

The contract at issue in this case was solicited and awarded in 1998. Therefore, in considering the constitutionality of the 1207 program as applicable to the contract awarded to ICT, the district court should consider evidence available to Congress that pre-dates the 1992 reauthorization.

**16.** The § 8(a) program is a business development program aimed at helping minorities who are the most disadvantaged. In order to participate in the § 8(a) program, one must have a personal net worth of less than $250,000. 13 C.F.R. § 124.106.

277, 106 S.Ct. 1842). In order for us to undertake meaningful appellate review, it is essential that the district court set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation, and set forth whatever inferences may be drawn as to whether such reports could constitute a "strong basis in evidence" for remedial action. *Id.* at 510, 109 S.Ct. 706 (plurality op., O'Connor, J.) (noting that the reviewing court should make "proper findings" which define both the "scope of the injury and the extent of the remedy necessary to cure its effects"). It is true that the same reports before the district court are before us on appeal, and that whether those reports constitute a "strong basis in evidence" to support the challenged program is a question of law that we will ultimately review de novo. However, like the Supreme Court, we believe that it is the province of the district court to evaluate whether evidence within the particular reports and studies before Congress was indeed sufficient to constitute a "strong basis in evidence" of discrimination or its lingering effects. *See Adarand III,* 515 U.S. at 237, 115 S.Ct. 2097 (remanding to lower court when lower court improperly applied a lessened level of scrutiny in its analysis of the evidentiary record).

 In the present appeal, the mere listing of pre-reauthorization references by the district court fails, we hold, to provide adequate findings on which to conclude that Congress had a "strong basis in evidence" for reauthorizing the 1207 program. Under *Croson,* a race-based classification may be enacted to remedy only identified systematic discrimination. Accordingly, generalized assertions of legislative purpose or statements generally alleging societal discrimination or an individual's anecdotal accounts of discriminatory conduct would have little or no probative value in supporting enactment of a race-conscious measure. *See Croson,* 488 U.S. at 498, 109 S.Ct. 706 ("[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy."); *Wygant,* 476 U.S. at 276, 106 S.Ct. 1842 ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."). The pre-reauthorization evidence cited by the district court does not show that the 1207 program was designed to address a remedial need, nor does it provide any indication that the 1207 program was enacted in response to systematic discrimination against Asian Pacific Americans or the lingering effects thereof. Moreover, while the SBA's findings support a conclusion that Congress believed there was sufficient evidence upon which to include Asian Pacific Americans in the SBA presumption, such a conclusion, made in 1980, seven years before the initial enactment of the 1207 program and almost twelve years before the time of the reenactment, does not necessarily support a conclusion that Congress had a "strong basis in evidence" for including (and, after 1992, for continuing to include) the presumption in the DOD program.

 Statistical evidence is particularly important to justify race-based legislation. *See Croson,* 488 U.S. at 509, 109 S.Ct. 706 (plurality op., O'Connor, J.) (noting that a prima facie case of discrimination can arise "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors"). Indeed, nearly every court of appeals upholding the constitutionality of a race-based classification has relied in whole or in part on

statistical evidence. *See, e.g., Cone Corp. v. Hillsborough County,* 908 F.2d 908, 915 (11th Cir.1990) (statistical disparity between "the total percentage of minorities involved in construction and the work going to minorities" shows that "the racial classification in the County plan [was] necessary"); *Adarand VII,* 228 F.3d at 1173 (disparity between minority availability and market utilization in the highway construction subcontracting industry raises an inference that discriminatory factors have created the disparity). The only pre-reauthorization statistical evidence cited by the district court is a statement in a 1975 House report that "only three percent of American businesses were owned by minorities, while minorities made up sixteen percent of [the] population." H.R.Rep. No. 468, 94th Cong., 1st Sess. 2 (1975), cited in *Rothe I,* 49 F.Supp.2d at 946. We conclude that this statistic itself is insufficient to support the constitutionality of the 1207 program as reauthorized. This report provides no data on how many minorities sought to own small businesses, nor does it take into account the particular industry of the contract at issue, let alone how many minority-owned small businesses in this industry were qualified, willing, and able to compete for DOD contracts, like the one at issue here. Further, the statistic does not take into account the fact that the sheer number of businesses owned by minorities may not be significantly correlated with the volume of business conducted by minority-owned businesses. Moreover, the statistic may be outdated, as it was already twelve years old at the time Congress initially enacted the 1207 program, and seventeen years old at the time of reauthorization.

There may be other evidence in the reports cited by the district court that could suffice to uphold the constitutionality of the 1207 program. However, we believe that it is the province of the district court to make express findings as to whether other evidence that was before Congress at the time of the reauthorization of the 1207 program is sufficient to support its constitutionality. We thus conclude that the pre-reauthorization evidence (at least insofar as it is relied on by the district court) is insufficient to satisfy the "strong basis in evidence" requirement in *Croson* for determining that there was a compelling interest for reauthorization of the 1207 program.[17]

### G. Post Enactment Evidence

The district court relied heavily on two sources of post-enactment evidence in upholding the constitutionality of the 1207 program. First, the court relied on the post-enactment evidence cited in the brief of its amicus curiae, the Asian American Legal Defense and Education Fund ("AALDEF"), to "bolster" its conclusion that Asian Pacific Americans had been discriminated against. *Rothe I,* 49 F.Supp.2d at 946 ("Congress has made findings spe-

---

17. Moreover, the evidentiary record, as presented by the district court, might, we think, be insufficient even if we evaluated the 1207 program under the more lenient standard of rational basis scrutiny, whereby a classification would be upheld so long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Recently, in *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Supreme Court held that even under rational basis scrutiny, the evidentiary record assembled to support a disability classification was inadequate, as Congress had not "identified a history and pattern of unconstitutional employment discrimination by the States against the disabled." *Id.* at 967–68 (noting that even if the half dozen examples of discrimination "showed unconstitutional action on the part of the States, these incidents taken together would fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based").

cific to Asian Americans ... and post-enactment evidence bolsters those findings."). In a footnote, the district court said that it relied on the brief and "evidence" cited by the AALDEF in "reaching [its] determination that Congress ha[d] a compelling purpose to act to remedy discrimination in government contracting." *Id.* at 947 n. 8.[18] Second, the court relied on a 1998 "Benchmark Study" conducted by the Department of Commerce. *Id.* at 947–48. The study, based on data collected from a random sample of federal procurements in fiscal year 1996, concluded that although SDBs in the "business services" industry had the capacity to perform 40.2 percent of the federal (civilian and military) contracting dollars, they were awarded only 26.4 percent of those dollars. *Id.* at 947 (citing 63 Fed.Reg. 35,714 (1998)).

▪ The circuit courts seem to be in substantial agreement that there are at least several permissible uses for post-enactment evidence. Evidence gathered after the initial enactment of a racial classification but before the reauthorization or reenactment of the program may certainly be considered to determine whether the program is constitutional as reenacted. *See Concrete Works of Colo., Inc. v. Denver,* 36 F.3d 1513, 1521 (10th Cir. 1994) (noting that post-enactment evidence may be considered when the legislative body modified and expanded the scope of a racial classification since the initial enactment). Moreover, post-enactment evidence may certainly be considered in determining whether a racial classification is constitutional as applied. It is for this reason that some circuit courts have considered post-enactment evidence in determining whether to issue injunctive relief, or in determining whether a race-based program is still narrowly tailored.

*See Contractors Ass'n of E. Penn., Inc. v. City of Phila.,* 6 F.3d 990, 1004 (3d Cir. 1993) ("*Contractors Ass'n I*") ("Consideration of post-enactment evidence is especially appropriate ... where the principal relief sought ... was an injunction."); *Concrete Works,* 36 F.3d at 1521 (holding that "post-enactment evidence, if carefully scrutinized for its accuracy, will often prove quite useful in evaluating the remedial effects or shortcomings of the race-conscious program").

▪ The use of post-enactment evidence to justify the constitutionality of a program, as enacted, presents a more difficult question. The Supreme Court has consistently held that once an affirmative action program is challenged in litigation, the program can only be upheld if there is a "strong basis in evidence" that it is remedial in nature. *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842; *Croson,* 488 U.S. at 500, 109 S.Ct. 706. Whether a legislature similarly must have a "strong basis in evidence" of discrimination at the time it first enacts a racial classification, or whether it may satisfy the "strong basis in evidence" standard in litigation by relying on additional post-enactment evidence is a question of which the circuit courts have expressed different views.

▪ It is clear from the Supreme Court opinions that a legislative body must have some evidence of discrimination before it in order to constitutionally enact a race-based program. *See id.* at 509, 109 S.Ct. 706 (plurality op.) ("If the city of Richmond had evidence *before it* that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion.") (emphasis added); *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842 ("[A] public employer

---

**18.** The court specifically stated, however, that it did not rely on the statistical evidence presented by the AALDEF. *Rothe I,* 49 F.Supp.2d at 947 n. 8.

like the Board must ensure that, *before it* embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted.") (emphasis added). Circuit courts have consistently held that, absent a showing that a legislature had *some* evidence of discrimination before it when it enacted a racial classification, the program would be unconstitutional. *See, e.g., Coral Constr. Co. v. King County.*, 941 F.2d 910, 920 (9th Cir.1991) ("[A]ny program adopted without some legitimate evidence of discrimination is presumptively invalid.").

While there is no question that a legislature must have some evidence of discrimination before it may constitutionally enact an affirmative action program, there has been arguable ambiguity as to whether legislatures may only act upon the same "strong basis in evidence" standard that ultimately must be demonstrated during litigation. Statements in *Croson* and *Wygant* arguably can be interpreted to suggest that the evidentiary burden faced by a legislature when it enacts a program is substantially less than when such a program is ultimately challenged in court. For example, in *Croson*, the Court noted that "[w]hile the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination ... with *some specificity* before they may use race-conscious relief." *Croson*, 488 U.S. at 504, 109 S.Ct. 706 (emphasis added). Similarly, Justice Powell's plurality opinion in *Wygant* states that "the Court has insisted upon *some showing* of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant*, 476 U.S. at 274, 106 S.Ct. 1842 (emphasis added). Some circuit courts have read these statements and others to support a holding that the evidentiary requirement imposed on legislatures is significantly lower than the "strong basis in evidence" requirement imposed when the program is challenged in litigation. *See, e.g., Coral Constr.*, 941 F.2d at 921 ("[W]here a state has a good faith reason to believe that systematic discrimination has occurred, and is continuing to occur, in a local industry, we will not strike down the program for inadequacy of the record if subsequent factfinding bears out the need for the program."); *Ensley Branch N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1568 (11th Cir.1994) ("It is not necessary ... for the City and Board to show that, when they approved the decrees, they already had strong evidence of ... discrimination."); *Contractors Ass'n of E. Penn., Inc. v. City of Phila.*, 91 F.3d 586, 591 n. 21 (3d Cir.1996) ("*Contractors Ass'n II*") (noting that "it is appropriate to consider any evidence, pre- or post-enactment, relevant to the issue of whether such discrimination, or the effects thereof, existed prior to 1982 [the date the challenged ordinance was first enacted]").

More recent Supreme Court cases clarify, however, that there is no difference in the evidentiary burden that must be faced during litigation (*i.e.*, a "strong basis in evidence") and the evidence that a legislature must have before it when it enacts a racial classification. In *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), the Court considered whether the State of North Carolina's congressional redistricting plan contained impermissible racial gerrymandering.[19] *Id.* at 909, 116 S.Ct. 1894. In

---

19. Although the issue in *Shaw* (racial gerrymandering) is different from the issue here (public contracting), we know from the Supreme Court's practice that it is appropriate to rely on precedents from other factual situations (such as employment, gerrymandering, or education) in determining whether the ra-

setting forth the standard governing whether the gerrymandering could be interpreted as necessary to avoid liability under the Voting Rights Act, 42 U.S.C. § 1973 (1994), the Court made clear that the state legislature would be required to have a "strong basis in evidence" that the gerrymandering was a necessary remedy *prior to* enacting the plan. *Id.* at 908, 116 S.Ct. 1894. "[T]he institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, *'before* it embarks on an affirmative-action program.'" *Id.* at 910, 116 S.Ct. 1894 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842) (emphasis in original). Importantly, the Court italicized the word "before," emphasizing that the legislature had to have the evidence at the time of its enactment. Moreover, alleviating any ambiguity as to the scope of the required evidence, the Court made clear that the legislature had to have a "strong basis in evidence." This, of course, is the same phrase that the Supreme Court used in both *Wygant* and *Croson* to describe the amount of evidence that must ultimately be shown during litigation to uphold the constitutionality of the program. The *Shaw* Court also emphasized that the reviewing court must assess what "actually" motivated the legislature, not what "may have motivated it." *Id.* at 908 n. 4, 116 S.Ct. 1894 ("[A] racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature. To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification."). A plurality of justices in *Croson* reasoned, "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative

body is pursuing a goal important enough to warrant use of a highly suspect tool." *Croson,* 488 U.S. at 494, 109 S.Ct. 706 (plurality op., O'Connor, J.). Construing federal law, a majority of justices in *Adarand III* adhered to the *Croson* plurality's recognition that governmental motivation plays a prominent role in a strict scrutiny analysis of a federal race-based scheme. *Adarand III,* 515 U.S. at 226, 115 S.Ct. 2097 (quoting the above-referenced language in *Croson* and subsequently stating: "We adhere to that view today."). It is axiomatic that a court cannot "smoke out" illegitimate uses of race in governmental pronouncements with evidence not available to the governmental body prior to promulgation.

Moreover, in *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), an opinion issued the same day as *Shaw* in which the court said that the results of the 1992 election could not be used to support a redistricting plan approved in 1991, Justice O'Connor, writing for a plurality, again quoted the "strong basis in evidence" test from *Shaw* and emphasized the word "before." *Bush,* 517 U.S. at 982, 116 S.Ct. 1941 (noting that the legislature "must have had a 'strong basis in evidence' to conclude that remedial action was necessary, *'before* it embarks on an affirmative action program,'" quoting *Shaw,* 517 U.S. at 910, 116 S.Ct. 1894) (emphasis in original).

Thus, *Shaw* makes clear that the quantum of evidence that is ultimately necessary to uphold racial classifications must have actually been before the legislature at the time of enactment. In light of *Shaw,* we conclude that if the pre-reauthorization evidence is insufficient to maintain the program when the program is

cial classification in contracting is constitutional. Therefore, we cite and rely on decisions arising in other factual situations for

what those opinions reveal on the constitutionality of racial classifications in all factual settings.

challenged as reauthorized, the program must be invalidated, regardless of the extent of post-reauthorization evidence. When a program that has been reauthorized is challenged, all evidence available to the appropriate legislative body prior to reauthorization must be considered in assessing the program's constitutionality. Requiring a "strong basis in evidence" before the legislature enacts or reauthorizes a racial classification is essential for verifying that a program is truly "remedial" in design. *See Croson,* 488 U.S. at 493, 109 S.Ct. 706 (plurality op., O'Connor, J .). Moreover, our holding finds support in the language of a decision of the Sixth Circuit (and of several district courts).[20]

■ Having identified what we believe to be the permissible uses of post-enactment evidence, we now turn to the district court's opinion. The district court explicitly stated that in reviewing whether Congress had established a compelling interest for enacting a racial classification, it relied on the post-enactment evidence presented by the AALDEF.[21] *Rothe I,* 49 F.Supp.2d at

946 n. 8. The district court also relied on the Benchmark Study to support the government's claim of a compelling interest, *id.* at 947, and to show that the 1207 program's stated numerical goal of five percent minority participation was proportional to the relevant market when the 1207 program was reauthorized in 1992. *Id.* at 952.

We hold that the district court impermissibly used post-enactment evidence to justify its conclusion that Congress acted with a compelling interest when it reauthorized the 1207 program in 1987 and 1992. On remand, the district court must reevaluate the constitutional sufficiency of the 1207 program as reauthorized by reliance only on the pre-reauthorization evidence. The district court, of course, may rely on post-enactment evidence for other purposes. Post-enactment evidence would be particularly relevant in determining whether the 1207 program was constitutional as applied (i.e., whether or not there still exists a compelling need for the program and whether the program is still narrowly tailored).

---

**20.** *See Associated Gen. Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730, 738 (6th Cir. 2000) (noting that the district court did not err in refusing to allow the state's motion for a continuance to supplement the existing data, because "under *Croson,* the state must have had a sufficient evidentiary justification for the racially conscious statute in advance of its passage; the time of a challenge to the statute, at trial, is not the time for the state to undertake factfinding."); *Associated Utility Contractors of Md., Inc. v. Mayor and City Council of Balt., Inc.,* 83 F.Supp.2d 613, 621 n. 6 (D.Md.2000) (disagreeing with decisions of several other courts finding post-enactment admissible in the *Croson* analysis, because the Supreme Court has "provide[d] controlling authority on the role of post-enactment evidence in the 'strong basis in evidence' inquiry"); *W. Tenn. Chapter of Associated Builders and Contractors, Inc. v. City of Memphis,* 138 F.Supp.2d 1015, 1022 (W.D.Tenn.2000) (holding that the use of post-enactment evidence "in determining whether the legislative body

... had a strong basis in evidence of past discrimination before implementing the plan, is antithetical to equal protection doctrine," but that it could be used to "supplement the statistical foundation showing the City's passive or active discriminatory practices").

**21.** If the district court relied on the post-enactment evidence offered by the AALDEF simply to supplement a constitutionally sufficient pre-reauthorization record, we do not think such use would be improper under our holding today. However, although the district court first used the term "bolster," in a footnote, it explicitly stated that it was relying on the AALDEF's brief in "determining" that the government acted with a compelling interest. *Rothe I,* 49 F.Supp.2d at 946 n. 8. We take this statement to mean that the district court relied on post-enactment evidence to satisfy the legislature's duty under *Croson* to have a "strong basis in evidence" for racial discriminatory conduct.

## H. Factors for the District Court to Consider on Remand

We remand for a determination of the constitutionality of the 1207 program under a strict scrutiny standard, particularly in accordance with the principles set forth in *Croson* and *Adarand III*. As set forth above, Congress' decision to enact race-based legislation must be reviewed under the same, non-deferential analysis that applies to state or municipal racial classifications. The constitutionality of the 1207 program must be assessed as reauthorized in 1992, as applied to Rothe's bid in 1998, and at present, to the extent that declaratory or injunctive relief is still sought. Following are general principles to be considered on remand.

### 1. Compelling Interest

■■■■ *Croson* provides that race-based classifications are "strictly reserved for remedial settings." *Croson*, 488 U.S. at 493, 109 S.Ct. 706 (plurality op., O'Connor, J.). Accordingly, the 1207 program cannot be constitutional unless it was indeed enacted as a remedial measure. In order to ensure that the motive for the 1207 program was legitimate (and not merely the product of "illegitimate racial prejudice or stereotype" or enacted in response to non-racial factors hindering minority participation), the district court must "define both the scope of the injury and the extent of the remedy necessary to cure its effects." *Id.* at 510, 109 S.Ct. 706. If the court determines that the 1207 program is remedial in nature, it should specify whether it is a remedy to correct present discrimination, or only to counter lingering effects of past discrimination. If the case is best characterized as a lingering effects case, the district court would need to make an assessment as to whether the evidence is still probative, *i.e.*, whether the effects of past discrimination have attenuated over time, or if in determining the constitutionality of the 1207 program as applied, whether the lingering effects are still present or were present in 1998 when the 1207 program was applied to Rothe's and ICT's bids. Moreover, the district court should also specify whether the government's involvement in the discrimination or lingering effects is so pervasive such that the government (and in particular, the DOD) became a "passive participant" in perpetuating it. *See id.* at 492, 109 S.Ct. 706 ("[I]f the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry ... the city could take affirmative steps to dismantle such a system.").

■■■■ The district court properly determined that there are important differences between the 1207 program and the program at issue in *Croson*, particularly as to geographic scope. As noted above, these factual differences do not influence the standard of review, which is necessarily strict scrutiny. However, for purposes of determining whether Congress had a "strong basis in evidence" for enacting the 1207 program, and whether the program is narrowly tailored, the district court is certainly correct that Congress had a "broader brush" than municipalities for remedying discrimination. *Rothe I,* 49 F.Supp.2d at 944. Whereas municipalities must necessarily identify discrimination in the immediate locality to justify a race-based program, we do not think that Congress needs to have had evidence before it of discrimination in all fifty states in order to justify the 1207 program. *See Adarand VII*, 228 F.3d at 1165 ("The fact that Congress's enactments must serve a compelling interest does not necessitate the conclusion that the scope of that interest must be as geographically limited as that of a

local government."). Contrarily, evidence of a few isolated instances of discrimination would be insufficient to uphold the nationwide program. Where to draw the line is in the first instance a task for the district court.

Furthermore, the district court should determine whether evidence of discrimination is sufficiently pervasive across racial lines to justify granting a preference to all five purportedly disadvantaged racial groups included under the 1207 program. As noted by the *Croson* Court, Congress may not justify a racial preference that benefits all minorities merely by identifying discrimination as to one racial group. In finding the racial preference in *Croson* "grossly overinclusive," the Supreme Court noted that the Richmond City Council had only identified instances of discrimination against blacks, with "absolutely no evidence of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry." *Croson*, 488 U.S. at 506, 109 S.Ct. 706. A racial preference cannot be "remedial" when a disadvantaged minority member must share his or her remedial relief with other minorities that have never been the victim of discrimination. *Id.* Accordingly, Congress must have identified a pattern of discrimination that broadly affected all the minorities who receive a preference under the 1207 program. This is not to say that there must have been particular findings (either express or implied) as to each racial subclass in order to justify the program. Rather than identify instances of discrimination against each particular Asian subgroup (i.e., Korean Americans, Chinese Americans), the district court might properly determine that Congress had before it evidence of discrimination against Asian Pacific Americans in general. *Adarand VII*, 228 F.3d at 1176 n. 18

(rejecting contention that "Congress must make specific findings regarding discrimination against every single sub-category of individuals within the broad racial and ethnic categories designated . . .").

In addition to reviewing whether there was evidence of discrimination (or the lingering effects thereof) against each minority group included in the 1207 program, the district court must also determine whether discriminatory conduct or effects were experienced in the specific industry. A reviewing court must not "blindly" defer to the government's definition of the affected industry. *See Croson*, 488 U.S. at 501, 109 S.Ct. 706 ("The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis."). In this case, the government argues that the industry grouping "business services" in all federal procurement as defined by the Benchmark Study is the appropriate industry; Rothe, in contrast, argues that the industry grouping should be limited to computer maintenance and repair services in the defense industry. We decline to define the relevant industry, because we think that it is incumbent for the district court to review the evidence on which it relied and make findings as to (1) what the relevant industry is; and (2) whether there was sufficient evidence of discrimination in which to justify application of a racial preference in that industry, both in 1992, in 1998, and at the present time (to the extent Rothe still seeks injunctive relief).

Furthermore, the district court should determine whether the evidence before it is sufficiently timely and sufficiently substantive (i.e., not merely anecdotal) to properly support the program's constitutionality. We note that much of the evidence referenced by the district court was more than a decade old by the time of the 1207 program's reauthorization in 1992.

Whether this evidence remained viable in 1992 when the program was reauthorized, in 1998 when the program was applied to Rothe's bid, or in 2001, when a ruling on the requested injunctive relief may issue is a factual question for the district court to resolve.

### 2. Narrow Tailoring

■ On remand, the district court must also reassess whether the 1207 program is narrowly tailored, both as reauthorized and as applied, under a non-deferential version of strict scrutiny. There are six factors commonly considered in the narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness or underinclusiveness of the racial classification. *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Croson,* 488 U.S. at 506, 109 S.Ct. 706 (including over- and under-inclusiveness in the narrow tailoring factors); *Adarand III,* 515 U.S. at 238–39, 115 S.Ct. 2097 (noting that the lower court on remand should consider whether the legislative body had tried race-neutral alternatives and whether the program was limited in duration). In this case, the district court thoroughly analyzed and correctly concluded that the 1207 program was flexible in application, limited in duration, and that it did not unduly impact on the rights of third parties. *Rothe I,* 49 F.Supp.2d at 951–53. The district court, however, did not properly analyze three of the other narrow tailoring factors.

### a. Examining the Efficacy of Race Neutral Alternatives.

In this case, the district court considered whether Congress had attempted race-neutral measures before enacting the 1207 program. Because it applied a deferential analysis, however, it did not strictly scrutinize whether Congress found these race-neutral alternatives ineffective. *Id.* at 950 (noting that "deference should be given to congressional findings that discrimination has continued and must be addressed, as evidenced by the repeated renewal of the preference program at issue in this case"). On remand, the district court should conduct a probing analysis of the efficacy of race-neutral alternatives, for instance, by inquiring into any attempts at the application or success of race-neutral alternatives prior to the reauthorization of the 1207 program. The Supreme Court has also suggested that the legislative body make findings that pre-existing antidiscrimination provisions have been enforced but unsuccessfully. *See Croson,* 488 U.S. at 502 n. 3, 109 S.Ct. 706 ("The complete silence of the record concerning enforcement of the city's own antidiscrimination ordinance flies in the face of the dissent's vision of a 'tight-knit industry' which has prevented blacks from obtaining the experience necessary to participate in construction contracting.").

### b. Evidence Detailing the Relationship Between the Stated Numerical Goal of Five Percent and the Relevant Market

The district court relied exclusively on the Benchmark Study in assessing whether the five percent goal was proportionate to the number of qualified, willing, and able SDBs in the relevant industry group. *Rothe I,* 49 F.Supp.2d at 952. Because the Benchmark Study was conducted after the 1992 reauthorization, it is not relevant to determining, whether, at the time of the program's reauthorization, a relationship was shown between the stated numerical

goal of five percent minority participation and the relevant industry. Thus, on remand, the district court must determine whether there is any pre-reauthorization evidence linking the numerical goal with the appropriate pool. The district court, of course, may rely on post-enactment evidence, such as the Benchmark Study (provided the court determines the statistical comparison is appropriate) to determine whether in 1998, the five percent goal was still proportionate to the pool of qualified, willing, and able bidders, or whether to grant injunctive relief to the extent Rothe still requests it.

### c. Over- and Under–Inclusiveness

The district court here deferred to Congress' conclusion that the 1207 program was not overinclusive. *Id.* at 953 ("Obviously, Congress must have a basis for acting to remedy discrimination, and obviously, its acts must be aimed at that discrimination."); *id.* (finding sufficient the finding that since all of the minorities included in the 1207 program live in the United States and have been discriminated against, the program is not overinclusive.). On remand, the district court must strictly scrutinize whether the 1207 program was overinclusive, by determining whether each of the five minority groups presumptively included in the 1207 program suffered from the lingering effects of discrimination so as to justify inclusion in a racial preference program extending to the defense industry.

Moreover, since the 1207 program incorporates its presumption of social and economic disadvantage from § 8(d), any con-stitutional defects in enactment of § 8(d) are relevant to the court's analysis. The United States Court of Appeals for the Tenth Circuit held in *Adarand VII* that to be narrowly tailored, there must be an individualized showing of economic disadvantage for each minority in the § 8(d) program. *Adarand VII*, 228 F.3d at 1184 ("[W]e must conclude, under *Croson,* that the § 8(d) method of certification ... is not narrowly tailored insofar as it obviates an individualized inquiry into economic disadvantage."). The court said that to require "a separate showing of [economic and social] disadvantage [such as a short narrative statement of economic disadvantage faced] would help address the Court's concern in *Croson* that a government entity undertake the necessary administrative effort 'to tailor remedial relief to those who truly have suffered from the effects of prior discrimination.'" *Id.* (citing *Croson,* 488 U.S. at 508, 109 S.Ct. 706).[22]

### Conclusion

Because the district court failed to analyze the constitutionality of the 1207 program under the strict scrutiny analysis required by the Supreme Court in *Croson* and *Adarand,* and relied on post-reauthorization evidence to determine the constitutionality of the 1207 program as reauthorized, we vacate the district court's judgment and remand for the requisite findings to be made.

*VACATED AND REMANDED.*

---

22. In 2000, new regulations extended the individualized determination of economic disadvantage in § 8(a) to § 8(d). *See Adarand VII,* 228 F.3d at 1185; 13 C.F.R. § 124.1002(a) (2000) (incorporating § 8(a) criteria from 13 C.F.R. pt. 124, subpt. B); 48 C.F.R. § 19.703 (2000) (eliminating the race-based presumption of economic disadvantage of the former regulation); 13 C.F.R. § 124.104(b)(1) (2000) (requiring submission of a narrative statement of purported economic disadvantage for each group). At the time of the contract award in this case, in 1998, however, § 8(d) did not include a requirement of an individualized showing of economic disadvantage.